Jimmy F. **TAYLOR,** as the Administrative Committee, and for and on behalf of the Welfare Plan of Mercantile Employees' Beneficiary Association, and Ameritrust Texas, N.A., Trustee of Mercantile Employees' Beneficiary Association Trust, Plaintiffs,

v.

**BANK ONE, TEXAS, N.A.,** the Deposit Insurance Bridge Bank Employees' Beneficiary Association Trust, the Welfare Plan of Bank One, Texas, Employees' Beneficiary Association, Banc One Mortgage Company of Texas f/k/a MBank Mortgage Company, MCorp, MCorp Financial, and MCorp Management, Defendants.

Civ. A. No. H–90–3815.

United States District Court, S.D. Texas, Galveston Division.

Jan. 15, 1992.

Order on Motion to Amend or Alter Judgment Feb. 18, 1992.

John H. Bennett, Jr., Pohl & Bennett, Houston, Tex., for plaintiffs.

Thomas D. Graber, Hopkins & Sutter, Dallas, Tex., Peter F. Lovato, III, Nancy J. Anglin, Dallas, Tex., for defendants Bank One Texas, N.A., Bank One Texas Employees' Beneficiary Trust, Welfare Plan of Bank One, Texas, Employees' Beneficiary Ass'n and Banc One Mortg. Co. of Texas.

Riva T. Johnson, Hughes & Lace, L.L.P., Dallas, Tex., Douglas S. Sandage, Sullivan, King, & Sabom, P.C., Houston, Tex., for defendants MBank El Paso N.A., MBank Brownsville, N.A., MBank New Braunfels N.A. and MBank Waco N.A.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

KENT, District Judge.

This cause came on for non-jury trial, before this Court, on November 13–15, 1991. The case was excellently prepared and presented, by both sides. Not only was the Court privileged to witness exceptional advocacy, by all counsel involved in the case, but the Court had the additional privilege of meeting and listening to some remarkable witnesses. This Court is absolutely convinced that this case involves no wrongdoing on the part of anyone, and the Court perceives sincerely high motives on the part of all concerned. Unfortunately, that only makes this decision all the more difficult. From a legal standpoint, this Court must address an important issue of first impression: which is paramount between the F.D.I.C., and its need for transaction finality in the reorganization of failed banks, or E.R.I.S.A., which safeguards the rights of the employees of such institutions. Factually, and on a much more human level, this Court is faced with balancing the legitimate needs of Plaintiffs, representing the interests of numerous retired and disabled former employees, who have every right to be secure in their retirement, and to be provided with adequate medical insurance and related benefits, against the equally legitimate needs of a fledgling bank, which, like the Phoenix, arose from the ashes of the demise of a predecessor entity, and their respective welfare and benefits plans, the integrity of which this Court must take pains to properly protect. Out of such disparate interests in this case, each seeking only fairness, this Court must fashion a remedy that tries to achieve justice.

It is with that high purpose in mind, and the Court's full knowledge of and appreciation of the needs of the respective parties, that the Court hereby enters the following Findings of Fact and Conclusions of Law, issued pursuant to F.R.Civ.P. Rule 52(a). Any finding of fact which may be a conclusion of law is adopted as such, and any conclusion of law which may be a finding of fact is adopted as such. Findings of fact not expressly made are deemed made in support of the Judgment.

## FINDINGS OF FACT

1. Defendant MCorp is the owner of Defendant MCorp Financial and Defendant MCorp Management, which respectively own and manage Texas banking associations whose names include "MBank." Since March 1989, MCorp, MCorp Financial and MCorp Management have operated under Chapter 11 bankruptcy proceedings pending in the United States Bankruptcy Court for the Southern District of Texas. (PTO Adm 16).

2. MCorp is the sponsor of several "welfare benefit plans" (as defined by Sec. 3(1) of the Employee Retirement Income Security Act of 1974) (E.R.I.S.A.), that are included within the MCorp Cafeteria Plan and are collectively known as the Mercantile Employees' Beneficiary Association Plan (the "MEBA Welfare Plan"). Plaintiff Jimmy F. Taylor administers welfare benefits under the MEBA Welfare Plan. (PTO Adm 1).

3. The funding medium for the MEBA Welfare Plan is Plaintiff, the Mercantile Employees' Beneficiary Association Trust (the "MEBA Trust"). The Trustee for the

MEBA Trust is Ameritrust Texas, N.A., a company that was formerly known as MTrust Corp, N.A. (PTO Adm 7 and 8).

4. Plaintiff Jimmy F. Taylor is familiar with both the Plan and the Trust. In his view, trustees of the Trust take directions for disbursements from the Plan's Committee. According to Sec. 11, of the Trust Document, if one of the employers fails, funds are immediately dedicated to beneficiaries, regardless of who contributed them. (Exh. 1).

5. Deposit Insurance Bridge Bank, National Association (the "Bridge Bank") is a statewide national banking association that was chartered and owned on March 28, 1989 by the Federal Deposit Insurance Corporation ("FDIC"). The Bridge Bank changed its name to Bank One, Texas, N.A. ("Bank One") when Banc One Corporation began to manage the Bridge Bank. Later, the FDIC sold stock in the Bridge Bank to Banc One Corporation. (PTO SC 3). References to Bridge Bank and Bank One N.A. are interchangeable.

6. On March 28, 1989, the Office of the Comptroller of Currency declared twenty of the MBanks insolvent: MBank Abilene, N.A., MBank Corsicana, N.A., MBank Dallas, N.A., MBank Marshall, N.A., MBank Mid Cities, N.A., MBank Wichita Falls, N.A., MBank Houston, N.A., MBank The Woodlands, N.A., MBank Denton County, N.A., MBank Orange, N.A., MBank Sherman, N.A., MBank Alamo, N.A., MBank Austin, N.A., MBank Brenham, N.A., MBank Odessa, N.A., MBank Round Rock, N.A., MBank Greenville, N.A., MBank Longview, N.A., MBank Fort Worth, N.A., and MBank Jefferson County, N.A. For convenience the MBanks that were declared insolvent are referred to as the "Failed Banks" to distinguish them from several other MBanks that were not declared insolvent and that continued in business. (PTO Adm 17).

7. On March 28, 1989, the FDIC was appointed Receiver for each of the Failed Banks. On March 28, 1989, the Receiver for each Failed Bank sold certain assets to Deposit Insurance Bridge Bank, National Association (the "Bridge Bank"). The Bridge Bank purchases those assets from the Receiver and assumed certain liabilities pursuant to twenty separate Purchase and Assumption Agreements. (*See, e.g.* Exh. 16). For purposes of this case the Purchase and Assumption Agreements may be considered identical. (PTO Adm 20) The employees of the Failed Banks went to work for Bridge Bank the morning of March 29, 1989. (PTO SC 4).

8. On May 5, 1989 Bridge Bank established Defendant, the Deposit Insurance Bridge Bank Voluntary Employees' Beneficiary Association (the "Bridge Bank Welfare Plan"). (PTO Adm 21).

9. On May 5, 1989, the MCorp Compensation Committee undertook an extraordinary meeting, at which it discussed MCorp's benefit plans. The meeting was apparently urgent, because MCorp was collapsing. Bridge Bank was thinking about participating only long enough to withdraw funds, intending to thereafter "freeze out" former employees. An amendment to the MEBA Trust (Exh. 26) was voted on, and delivered to the President of the Bridge Bank. A letter confirming this intention was also transmitted. (Exh. 27). These indicate a controversy as to whether the funds were to remain in the immediate trust.

10. Peter Bartholomew was the President and CEO of MCorp. He directly participated in all of the administrative activities pertaining to this suit, from his management position. On May 5, 1989, he wrote to James Gardner, his counter-part at Bridge Bank, with the intention of putting Bridge Bank on notice that no one could adopt any successor plans without approval of MCorp. (Exh. 27). His intent was to settle uncertainties regarding benefits issues. Certain actions were contemplated at the Bridge Bank that would effect MCorp employees and former employees, particularly retirees who had retired prior to 1984, when MCorp was created. It was his intent to safeguard their status with any successor trust. Similarly, he indicated that any funds continuing to be held in the MEBA Trust were not available to MCorp, and that MCorp was denied ac-

cess to such because they were held solely for the benefit of the trust beneficiaries.

11. On May 10, 1989, Bridge Bank gave notice that it wanted to withdraw from the MEBA Plan, and that it stood in the shoes of a "successor employer". (Exh. 32).

12. Mr. Bartholomew recalled seeing Bridge Bank's notice of its intent to withdraw from the MEBA trust (Exh. 32), but he did not consider it binding. He conceded that Bridge Bank asserted that they stood in separate shoes, but it is his position that the MCorp compensation committee and board had the right to approve any successor trust, and that regardless of their intent otherwise, any subsequent trusts were only successor trusts. Of particularly moment, he testified that Bridge Bank collected and retained money from former employees of MCorp, and therefore, he feels certain that the Bridge Bank trust took over as merely a successor trust.

13. Bridge Bank attempted to set up its own Plan, and related Trust agreement. However, for all intent and purposes, it adopted identical provisions, of the predecessor Plan and Trust. No Summary Plan Description or benefit selections were undertaken by the Bridge Bank, as would be required, unless the Bridge Bank is a successor interest. No Form 1024 was completed, as required by Section 501(c)(9). No recalculation was mandated, for Plan participants, with regard to accumulation of deductibles, again indicating clear intent of the establishment of merely a successor plan.

14. Critically, on May 10, 1989, written notice of Bridge Bank's withdrawal from the MEBA Trust was tendered to the MCorp's Benefits Committee. (Exh. 32). The intent of this letter was to allow Bridge Bank to exercise its right to become a successor trust. Thereafter, Bridge Bank never contributed to the trust, and never withdrew funds therefrom, although it has attempted to do so.

15. On June 5, 1989, as authorized on May 5, 1989, Bridge Bank established Defendant, the Deposit Insurance Bridge Bank Employees' Beneficiary Association Trust (the "Bridge Bank Trust"), for the purpose of acting as a funding medium for the Bridge Bank Welfare Plan. (PTO Adm 22).

16. The MCorp Cafeteria Plan provides the structure of the MEBA Welfare Plans. (Exh. 2). The Benefit plans offered under the Cafeteria Plan may be covered in separate plan documents, trust agreements, or administrative service contacts, all of which are adopted into the MCorp Cafeteria Plan by reference. *Id.* §§ 1.3; 5.1. Other plan documents, trust agreements or contracts for benefits are incorporated into the Cafeteria Plan, but in case of conflict with the terms of the Cafeteria Plan, the terms of the *other* plan documents control. *Id.* § 5.1.

17. Other plan documents include the MEBA Trust (Exh. 1), the July 1, 1984 Mercantile Texas Corporation Supplemental Health Care Plan, as amended into the MCorp Cafeteria Plan (Exh. 3), the July 1, 1984 Administrative Services Agreement between Prudential Mercantile Texas Corporation (Exh. 4), a Group Policy for accidental death and dismemberment (Exh. 5), a Group Policy for life insurance (Exh. 6), a Group Policy for dental care (Exh. 10), the MEBA Trust Agreement (Exh. 1), and the January 1, 1989 Benefits Handbook, Summary Plan Description (Exh. 14).

18. Additionally, the MEBA Welfare Plan includes the MCorp Cafeteria Plan for Part–Time Employees, the MCorp Dependent Care Plan, and the MCorp Supplemental Health Care Plan. (*See* Exh. 29). Among other things, the Administrative Services Agreement and the Group Policy for life insurance explicitly cover retired and disabled employees and their beneficiaries. (Exh. 4 and 6).

19. The MEBA Welfare Plan (which includes the MCorp Cafeteria Plan by incorporation) provides coverage for "participants" of participating employers in the MEBA Welfare Plan. (Taylor Test). "Participants" include active employees, retired employees, disabled employees, and their beneficiaries. (PTO Adm 9).

20. Under the MEBA Welfare Plan, participating employers are liable to their

participants to pay all benefits that are not funded or insured. (Exh. 2 § 10.3).

21. Prior to March 28, 1989, each Failed Bank was a participating employer in the MEBA Welfare Plan. (PTO Adm 19) The Failed Banks had a large population of participants, approximately 900 of whom retired or became disabled before March 28, 1989. (Exh. 77).

22. Stephanie Burks testified live, for several hours, in this trial. She is presently the Personnel Director for the City of Houston, and was formerly the Welfare Benefits Administrator for MCorp, at the time of the breakup of that Company. She designed and, at some point, administered all of the welfare benefits plans in controversy in this cause. She was associated in a successor role with Bridge Bank/BANK ONE, for the period of March, 1989, through October, 1989.

Ms. Burks presented to the Court a remarkable profile in courage. In fact, upon the completion of her testimony, this Court was specifically moved to commend her actions, in a time of legitimate crisis, in the record of these proceedings. The Court indicated then, and reaffirms now its genuine admiration of her activities, on behalf of others. At a time when her Company was in a state of collapse and apparent disorganization, and when everyone else in the Company was attempting to distance themselves from the crisis at hand, Ms. Burks thought only of the some 7,000 employees of the MCorp, and the necessity of continuing their benefits and remuneration, rather than of her own self-interests, or those of her superiors. She "stepped up to the plate", in a remarkable fashion, bringing order to chaos, and ensuring, throughout the period of transition, as smooth and orderly a flow of benefits as possible to those in critical need. This Court is genuinely honored to have observed, through her testimony, her actions during this time. If ordinary citizens were entitled to the receipt of some sort of medal, for heroism in ordinary affairs, she would surely be a most worthy recipient.

23. At the same time, and notwithstanding this Court's enormous admiration of her actions *in extremis*, and notwithstanding her intentions at the time, it is the sincere belief of the Court that her actions alone, and without proper supplemental steps being taken, could not properly establish a separate and independent trust for the benefit of the employees only of Bridge Bank/BANK ONE. Indeed, the overwhelming facts of this case, her heroic actions notwithstanding, indicate that Bridge Bank/BANK ONE's purported Trust was a successor only, and must accept both the liabilities and assets of any predecessor trust. In this regard, the Court considers the critical divergence between the obligations of a successor trust, to assume the full liabilities of a predecessor trust, as mandated by E.R.I.S.A., and a legitimate need of the FDIC to fashion a new bank from the ashes of an old bank, and in the process, to curtail any more liabilities or obligations than are absolutely necessary to be undertaken, to maintain the integrity of such a successor institution. This Court firmly concedes Congressional intent, with regard to the need of the FDIC to be able to move with finality, in this regard. However, this Court feels more strongly that it should not be entitled to do so, at the abject expense of retirees and disabled persons, who spent their lives in the worthy cause of accruing interest in a plan which the FDIC contends can be evaporated with the stroke of a pen. These people paid a price, over the course of their lifetime, and have every reason to expect a return on their "investment". The plan beneficiaries' interests are paramount, and it is the intent of this Court to ensure that they are properly protected.

24. Ms. Burks was clearly operating under the MEBA Plan at the time of MCorp's collapse. In a moment of crisis, she indicted that she had a responsibility to ensure that "7,000 people were covered by some plan". In her view, Bridge Bank would be responsible for paying claims incurred after March 29, 1989, and the new plan would have the same provisions as the old. Her intent was that the employees would not see any "change", and it was her further intent that the plans were to be "mirror plans". In her mind, she intended a dis-

tinction between the two plans, with one being for the benefit of former employees and disabled persons, of MCorp, and the new plan pertaining solely to the employees of the Bridge Bank.

25. Ms. Burks did not perceive that the new plan required reaccumulation of medical deductibles, and lifetime benefit limits remained in effect. No re-enrollment in the Bridge Bank Plan was required. The Summary Plan Description, such as it existed for the successor plan, was to the be same for both plans. The essential provisions of the old plan continued in effect.

26. Remarkably, between March 28, 1989, and May 5, 1989, Ms. Burks conceded that there was no Bridge Banks Plan or Benefits Committee. Nevertheless, in a complete vacuum of authority, she understood her fiduciary obligations to administer "a plan", to ensure continued benefits for all concerned. Her courage in this regard, in the face of the real potential for accrual of possible personal liability, and the apparently complete absence of any guidance from her alleged superiors, is absolutely remarkable. (Exhs. 13, 27 and 32). Ms. Burks expressly noted that retired employees were not to be "cut out" of the "interim" plan. It was not her intent to deprive anyone of any benefits under "any plan". The status of retirees, disabled persons, and the like was never clarified, however; and she conceded that while she wanted them taken care of, "from day one, there arose a question of who owned them".

27. In her view, a separate plan was created, because Bridge Bank: created new plan documents; had a new sponsor; had a new pool of participants; wrote out a new trust agreement; had new attorneys; had new directors; had a new plan committee; had new contracts and resolutions; had new policies; and, had new trust accounts. However, of critical importance, the Court again notes that a number of critical things were similarly not undertaken, to properly distinguish the plans, as enumerated in Finding No. 13, above. (See also, Findings Nos. 30, 31, 32, 33, 34, 35, 36, 37, 38, and 42, herein.) Moreover, Steve Eschback, an actuary, who testified on behalf of Plaintiff, stated unequivocally that only a successor trust can take the money out of an existing trust, and that it is impossible to take assets from a predecessor trust selectively. A successor trust must accept both assets and liabilities. (Emphasis added.)

Therefore, in his view, a successor trust cannot take responsibility solely for current employees. It absolutely must accept full responsibility for retired employees, disabled employees, and the like. Indeed, in his view, if the Bridge Bank Trust wanted to retain its VEBA status, it would have had to take the retirees of the predecessor trust with it. He readily conceded that a subsequent employer could set up a new trust, but that it cannot take funds from the predecessor trust without incurring liability for former employees or retirees.

28. Philip Kenny was called as a witness by BANK ONE. He is that Company's Personnel Manager. In the relevant time frame, he was Stephanie Burks' boss, although he conceded virtually no relevant knowledge, and no meaningful input into this controversy. Of significance, however, he noted that during the transition phase and the existence of Bridge Bank, all benefits decisions were made by the FDIC. He resigned from the Benefits Committee of that bank, because of FDIC intervention, and his apprehension regarding personal liability.

29. Jonathan Schreve was also called by Defendant, as an expert actuary. He is a remarkably bright individual, having a Bachelor of Science in mathematics, a number of academic honors, and membership in Phi Beta Kappa. He is a member of the American Academy of Actuaries, and is an impressive and completely credible witness.

Of critical significance, Mr. Schreve conceded that if BANK ONE wanted to set up a new trust, it should have properly sued the old trust for any funds it thought it would be entitled to, if it wanted to maintain a completely separate status. In his view, this was clearly the "cleanest way to do it". He conceded that a declaration by Bridge Bank merely that it intended to act as a "successor" created substantial ambi-

guity. He stated that the assumption of obligations of former employees was not what Bridge Bank wanted to do, "although it may be what it did", in his view.

30. After March 28, 1989, the Bridge Bank proceeded as if it were a participating employer under the MEBA Welfare Plan that later became a participating employer in a successor welfare plan to the MEBA Welfare Plan.

31. The Bridge Bank did not require the Bridge Bank employees to fill out new enrollment forms to participate in a new welfare benefits plan.

32. The Bridge Bank did not file a new Form 1024 notice and application to the Internal Revenue Service to qualify the Bridge Bank Plan as tax deductible under Section 501(c)(9) of the Internal Revenue Code. (Bridge Bank has not produced, or offered any other explanation for the absence of a new Form 1024 notice and application to the IRS.) (Taylor Test).

33. The Bridge Bank did not require its employees who had accumulated deductibles under the MEBA Welfare Plan to re-accumulate deductibles under the Bridge Bank Welfare Plan.

34. The Bridge Bank did not reinstate lifetime medical benefits limits under the Bridge Bank Welfare Plan for employees who had submitted medical claims under the MEBA Welfare Plan.

35. The Bridge Bank used the same "price tags" set for benefits and participation in the Bridge Bank Plan as were used in the MEBA Welfare Plan. (Burks Test).

36. Bridge Bank was obligated to provide a summary plan description to all its participants. (Exh. 110 at DEF 32134). The only summary plan description which Bridge Bank could have used to describe benefits provided to its eligible participants was the MCorp Summary Plan Description. (Exh. 14). The Bridge Bank did not prepare a new summary plan description for the Bridge Bank Welfare Plan. (Burks Test). (Bridge Bank has not produced or offered any other explanation for the ab-sence of a new summary plan description for the Bridge Bank Welfare Plan.)

37. The Bridge Bank collected premiums from Failed Bank participants who retired before March 28, 1989. (PTO Adm 34). (On August 22, 1989 the Bridge Bank entered into an administrative services agreement contractually permitting collection of retiree premiums for MCorp, but the Bridge Bank would not turn the retiree premiums over to MCorp.)

38. On or before May 5, 1989, and continuing until this litigation commenced, Bridge Bank claimed to be a participating employer in the MEBA Welfare Plan as a successor to the Failed Banks and to have established a welfare plan and a trust that were successors to the MEBA Welfare Plan and MEBA Trust.

39. On May 5, 1989, the Bridge Bank Board of Directors met and discussed the topic of employee benefit plans at length (Exh. 28):

Employee benefit plans were the next topic of discussion. Lawrence Merrigan noted that much had been discussed at the Board members lunch concerning benefit plans and that the Board understood the need to maintain employee benefits. Mr. Twomey commented that it was clearly to Bridge Bank's benefit to adopt the MCorp pension plan as its own in order to preserve any rights it might have to the excess in the benefit plan funds. Mr. Twomey directed the Board to Page 4 of the paper entitled "Pension Plans and Welfare Benefit Plants." Mr. Twomey stressed the basic nature of the benefit plans being put before the Board. Mr. Twomey added that one benefit of adopting the benefit plan for the Bridge Bank would be that a purchaser would not have to deal with MCorp, but only with the Bank. Upon motion of Quinton Thompson, seconded by Lawrence Merrigan, the Board unanimously approved the benefit plan presented with the proviso that the FDIC was welcome to comment on the plans. (The resolution regarding the benefit plans is contained in the permanent Board files and made a

part of these minutes as if fully set forth herein.)

40. The resolutions adopted by the Board explicitly state that the Failed Banks were each "participating employers" in the MEBA Welfare Plan; that a "participating employer" may withdraw from the MEBA Welfare Plan; that Bridge Bank should withdraw from the MEBA Welfare Plan and establish its own welfare plans as "successor plans" to the MEBA Welfare Plans, thus providing a continuation of benefits with no gap or lapse in coverage; that Section 11.02 of the MEBA Trust permits a successor to a participating employer to establish a separate trust for continuation of benefits; and that Bridge Bank should adopt its own trust as a "successor trust" to the MEBA Trust. (Exh. 29).

41. The Board's action on May 5, 1989 was presented to the Federal Deposit Insurance Corporation for review, and on May 17, 1989, the Bridge Bank board reviewed and approved the minutes of the May 5, 1989 special meeting. (Exh. 38). The May 5, 1989 Bridge Bank resolutions were never rescinded, amended or even criticized by BANK ONE or by the FDIC. (Bardner and Burks Test).

42. Pursuant to the May 5, 1989 resolutions, the Bridge Bank established the Bridge Bank Cafeteria Plan as a successor plan. The Bridge Bank Plan stated that "Bridge Bank has continued as a participating employer in the MCorp Plan since its inception on March 28, 1989, as successor to various national banking associations which were previously participating employers in the MCorp Plan." (Exh. 30). Bridge Bank never amended the Bridge Bank Cafeteria Plan to provide that it was not a successor plan or to delete its recitals that the Bridge Bank, since March 28, 1989, had been a participating employer in the MEBA Welfare Plan. Nor did Bridge Bank ever notify the retired and disabled employees of the Failed Banks that were not covered under the Bridge Bank Welfare Plan. (Burks Test).

43. On May 10, 1989, Bridge Bank gave notice that, in accordance with Section 11.02 of the [MEBA Trust] Agreement ("MCorp VEBA") [Bridge Bank], as successor employer to the [Failed Banks], has elected to establish a separate trust agreement for the continuation of benefits for its employees and Bridge Bank hereby request that the trust assets held in the MCorp VEBA on behalf of the active employees of Bridge Bank be transferred to MTrust Corp., N.A., as Trustee" of the Bridge Bank VEBA. (Exh. 32).

44. On May 10, 1989, the Bridge Bank gave thirty days advance notice of withdrawal and requested waiver of the thirty day notice requirement. (Exh. 32, at p. 1). On June 5, 1989, the Bridge Bank Trust Agreement was executed. That document provides that Bridge Bank "has continued as a participating employer in the MCorp Plan since its inception on March 28, 1989, and that "[e]ffective as of the date of withdrawal from the MCorp Plan by Bridge Bank ... all benefits ... under the MCorp Plans are continued under the [Bridge Bank] Plans...." (Exh. 48, at p. 1).

45. Bridge Bank's withdrawal from the MEBA Welfare Plan was not initiated until May 5, 1989, was not the subject of written notice until May 10, 1989, and without waiver of the thirty day notice requirement, could not have been effective until June 9, 1989. There is no evidence of any such waiver.

46. On May 5, 1989, the Compensation Committee of MCorp met at 7:00 a.m. at a specially called telephone meeting. (Taylor and Bartholow Test). At that time, the Compensation Committee attempted to adopt an amendment to the MEBA Trust. (Exh. 26).

47. The attempted amendment was not done in the ordinary course of business and was not done with the approval of the bankruptcy court. The amendment was attempted to protect the retired and disabled employees of the Failed Banks.

48. Before litigation of this civil action, Bridge Bank refused to acknowledge that the May 5, 1989 Amendment to § 11.02 of the MEBA Trust was legally binding. Bridge Bank consistently and repeatedly asserted that Bridge Bank was a successor employer and established the Bridge Bank

Welfare Plan and Bridge Bank Trust as successors to the MEBA Welfare Plan and MEBA Trust. (Exh. 28, 30, 32, 48 and 75), Bridge Bank's position was that the May 5, 1989 amendment was not binding on Bridge Bank. (Burks Test).

49. There is no sufficient evidence that Bridge Bank relied on MCorp's attempted amendment, or changed its position or was harmed in any manner by the attempted amendment. Even after the attempted amendment, both Bridge Bank and MCorp interpreted the MEBA Welfare Plan documents, including Section 11.02 of the MEBA Trust, to qualify Bridge Bank as a successor of the Failed Banks with the legal power to establish a successor trust to the MEBA Trust. (Exh. 47).

50. From May 10, 1989 until this civil action was commenced, BANK ONE, the Bridge Bank Welfare Plan and the Bridge Bank Trust claimed and attempted to recover funds out of the MEBA Trust. (Exh. 60, 63, 74 and 75).

51. On September 8 and 9, 1989, BANK ONE and the FDIC filed proofs of claim that included "a claim believed to be not less than $1,500,000" in connection with the MEBA Welfare Plan. (Exh. 74 and 75; see also Exh. 60 and 63).

52. Bridge Bank also held some $693,318.54 in assets of the MEBA Welfare Plan (Exh. 51). That money and later money collected by Bridge Bank directly from the Failed Banks' retirees was held by Bridge Bank "in a segregated account solely for the benefit of [Bridge Bank] employees." (Exh. 53 at p. 2).

53. By May 11, 1989, Bridge Bank recognized that the $693,318.54 check delivered to Kevin Twomey of Bridge Bank by Tom Sieling of MTrust was for March contributions to the MEBA Welfare Plan. (Exh. 33).

54. An exchange of correspondence transpired between the companies, on June 16, 1989, (Exh. 53), and June 23, 1989 (Exh. 61), seeking an exchange of $693,318.00. In Mr. Taylor's view, if Bridge Bank was attempting to contribute funds, it was clear to him that the BANK ONE trust was attempting to act as a successor trust.

However, Bridge Bank's view was that the funds were to be retained in a segregated account, solely for the use of Bridge Bank employees. However, this is untenable. Such a segregation of funds was never authorized by MCorp (Exh. 61 p. 3). Moreover, Bridge Bank continued accepting Plan contributions from retired MCorp employees. Therefore, it was clearly acting as a successor interest, whether it wanted to accept all of the liabilities, of the predecessor trust, or not.

55. Although Stephanie Burks recommended that the money be returned to the MEBA (Exh. 33), the funds were retained on instructions of the FDIC. (Kenny Test; see also Exhibits 55 and 59).

56. On August 22, 1989, Bridge Bank and MCorp entered into an Administrative Services Agreement under which Bridge Bank provided administrative services for MCorp and among other things collected group plan medical payments from retired and disabled employees of the Failed Banks. (Exh. 72). BANK ONE collected over $220,000.00 from the retirees and disabled employees of the Failed Banks. However, BANK ONE did not pay these funds over to the MEBA Welfare Plan until after this litigation commenced.

57. The result of this Agreement was that through December, 1989, Bridge Bank and later BANK ONE actually continued to deal with the MEBA trust problems, benefits and employee contributions. This was despite the alleged separation of the two plans. Consequently, it again appears clear to the Court that regardless of any intention on the part of Bridge Bank to create a completely separate and distinguishable plan, the proper requisite acts were never undertaken to completely set the successor plan up as a separate and distinct entity, (See Finding No. 13), and therefore, it is the Court's perception that it acted and could only act as a successor plan.

58. On June 16, 1989, the entire Bridge Bank Benefits Committee resigned. (Exh. 54). The FDIC had become involved to control the resolution of these disputes

[over return of the assets held in the MEBA Welfare Plan]. (Exh. 55 and 59; see also Exh. 81 at pp 80–81).

59. BANK ONE and the FDIC entered into a "Benefit Plan Litigation Agreement". (Exh. 84). That agreement deals with "claims made with respect to amounts held in trust under ... the Mercantile Employees' Beneficiary Association (the "VEBA") ..." the proofs of claim filed by BANK ONE and the FDIC. (*Id.* at p 1). The agreement gives the FDIC control over litigation of the claims, gives the FDIC the "right to prosecute such Claims in the name of Bank One", and provides BANK ONE shall not be required to pay costs of litigation. (*Id.* at pp 1–2). The agreement provides (*Id.* at p 3 emphasis supplied):

*The FDIC will get the benefit of any recovery on the VEBA claim ...,* but the method, manner, and amount of providing the FDIC with such benefit shall be agreed to by the parties at a later date.

60. The MEBA Welfare Plan funds were retained to influence payment of the claims asserted against the MEBA Welfare Plan and MEBA Trust. (Exh. 53).

61. In December, 1990, after this litigation was commenced, BANK ONE returned almost all of the funds withheld by a check for $1,018,183.04. (Exh. 92). BANK ONE did not pay the remaining funds (approximately $23,000.00) until November 1, 1991.

62. The June 7, 1989 Minutes of the First Meeting of the Executive Committee of Bridge Bank imply that Bridge Bank believed either that Bridge Bank's adoption of the MEBA Welfare Plan or the terms of the Purchase and Assumption Agreements gave Bridge Bank the right to participate in the MEBA Welfare Plan and MEBA Trust. (Exh. 49).

63. The Purchase and Assumption Agreements entered into between the FDIC as Receiver and the Bridge Bank provide an additional and distinct basis for Bridge Bank's liability to the Failed Banks' retired and disabled employees. (Exh. 16, §§ 2.1(b), 4.7(a)).

64. The supervisory officers and employees of the Bridge Bank who implemented and designed the Bridge Bank Welfare Plan and Bridge Bank Trust were former supervisory officers and employees of MCorp Management and the Failed Banks who were familiar with the terms of the MEBA Welfare Plan. (Taylor, Kenny and Burks Test).

65. Bridge Bank communicated to MCorp, to the MCorp Benefits Committees and to Bridge Bank's employees that there would be no gap or lapse in coverage and that the Bridge Bank Welfare Plan was virtually identical to the MEBA Welfare Plan. (Exh. 21, 29, 30 and 37). This was done to ensure that employees remained with Bridge Bank and that their morale was good. (Burks Test and Exh. 25 and 28). Had Bridge Bank communicated to its employees that there would be no coverage for retired and disabled employees of the Failed Banks it likely would have had an adverse impact on employee morale.

66. Participants in the MEBA Welfare Plan include retired and disabled employees of the Failed Banks and their beneficiaries. (Findings 11–12 above) The MCorp summary Plan Description must have been used by the Bridge Bank. (Finding 21 above) The MCorp summary Plan Description provides retirees are eligible to receive health and life insurance benefits. (Exh. 14, at pp 1 and 17). The early written communications made by Bridge Bank gave no indication that Bridge Bank would not provide retiree benefits. (Exh. 21 and 37).

67. Pursuant to Section 8.4(a) of the Bridge Bank Plan, the Bridge Bank Benefits Committee expressly reserved to itself the duties and powers "[t]o construe and interpret the Plan, and decide all questions of eligibility." (Exh. 30).

68. There is no sufficient evidence that the Bridge Bank Benefits Committee ever delegated any authority to Plan Administrator Stephanie Burks to determine the eligible participants under the Bridge Bank Plan. Stephanie Burks did testify that in her own opinion retirees and disabled employees of the Failed Banks were not covered by the Bridge Bank Plan and that she

believed MCorp, as the sponsor of the MEBA Welfare Plan, was liable to the retirees and disabled employees of the Failed Banks. However, she testified she had made no formal or written decision as Plan Administrator to deny coverage to the Failed Banks' retirees and disabled employees and that, while she was employed by Bridge Bank, she believed that decision was not hers to make.

69. There is no sufficient evidence that a determination to exclude participants who retired or became disabled before March 28, 1989, was ever made by the Bridge Bank Benefits Committee or by the Bridge Bank Board of Directors.

70. Furthermore, by claiming that Bridge Bank was a participating employer in the MEBA Welfare Plan and representing that its coverage for employees was virtually identical to the MEBA Welfare Plan coverage, Bridge Bank is estopped from now claiming that its coverage is limited to its active employees.

71. The Court concludes that on or before May 10, 1989 Bridge Bank became a participating employer under the MEBA Welfare Plan and assumed the duties and responsibilities of the MEBA Welfare Plan as a successor to the Failed Banks.

72. The Court concludes that by becoming a participating employer in the MEBA welfare Plan, Bridge Bank, as well as the Bridge Bank Welfare Plan and the Bridge Bank Trust, assumed the responsibilities of the Failed Banks to their retired and disabled employees.

73. Furthermore, the Court concludes that Bridge Bank is estopped to deny that it became a participating employer in the MEBA Welfare Plan and a successor to the Failed Banks with respect to the MEBA Welfare Plan because of its conduct, its claims to be a participating employer in the MEBA Welfare Plan and a successor to the Failed Banks, and its claims and attempts to recover funds out of the MEBA Trust.

74. Section 11.01 of the MEBA Trust provides that, upon dissolution or liquidation of any participating employer, the trust funds respecting that employer shall be paid out in the form of distributions to the participants unless a successor to the participating employer shall "elect to continue the Plan" or establish a successor plan and a successor trust. (Exh. 1).

75. The Bridge Bank's repeated claims that it is a successor to the Failed Banks and that it has established the Bridge Bank Welfare Plan and the Bridge Bank Trust as successors to the MEBA Welfare Plan and MEBA Trust prevented payment of the trust funds directly to the participants of he Failed Banks and their beneficiaries. The Bridge Bank's denial that the Bridge Bank, the Bridge Bank Welfare Plan or the Bridge Bank Trust were responsible for welfare benefits for retired and disabled employees covered by the MEBA Welfare Plan prevented the transfer of the trust funds to the Bridge Bank Trust. The Bridge Bank's inconsistent positions presented the dilemma that resulted in this litigation. (Taylor Test).

76. Under the MEBA Welfare Plan, participating employers are obligated to provide benefits to all of their participants, including retired and disabled employees. Participating employers may withdraw with respect to all of their participants, but they may not withdraw only with respect to their active employees. (Eschbach Test; Exh. 2, § 10.4).

77. The Committee and the MEBA Trust heretofore have continued benefits to the Failed Banks' previous participants who retired or became disabled before March 28, 1989 out of MEBA Trust funds contributed by the Failed Banks and their previous employees.

78. Funds held by the MEBA Trust allocable to the Failed Banks are presently nearing exhaustion because numerous claims have been paid under the MEBA Welfare Plan for previous participating employees of the Failed Banks and their beneficiaries. (Taylor Test).

79. Since March 28, 1989 Bridge Bank and BANK ONE have failed to pay any money to satisfy their obligations respecting employees of the Failed Banks who retired or became disabled before March 28, 1989. (Exh. 100).

80. Plaintiff Taylor, as administrator of the MEBA Welfare Plan, has maintained records that allocate the MEBA Trust Funds as among eligible participants of the Failed Banks and eligible participants of MEBA Welfare Plan employers other than the Failed Banks thus show which funds are transferable to the Bridge Bank Trust and which are not. (Exh. 100). Such allocations were not arbitrarily or capriciously made and were not an abuse of discretion. The Court approves such allocations and the methodology used by the MEBA Welfare Plan Administrator to make them.

## CONCLUSIONS OF LAW

1. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this civil action arises under the laws of the United States, specifically including the Employee Retirement Income Security Act of 1974, as amended (E.R.I.S.A.) 29 U.S.C. § 1132. All parties have been served and have appeared without contesting *in personam* jurisdiction. Rule 12(h)(1), F.R.Civ.P.

2. All necessary parties have been joined. Rules 12(b)(7), 12(h)(2), and 19(a), (b), F.R.Civ.P. *See, Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 110, 88 S.Ct. 733, 738, 19 L.Ed.2d 936 (1968) and *Ilan–Gat Engineers, ltd. v. Antigua Int'l Bank*, 659 F.2d 234, 241 (D.C.Cir.1981).

3. Every bridge bank has all corporate powers of a national bank and is subject to the same provisions of law as a national bank. 12 U.S.C. § 1821(n)(4). *See also Federal Deposit Insurance Company v. State Bank of Virden*, 893 F.2d 139 (7th Cir.1990). Bridge Bank had the power to elect and was qualified to become a successor participating employer in the MEBA Welfare Plan.

4. E.R.I.S.A. preempts state law. *Lee v. E.I. DuPont de Nemours & Co.*, 894 F.2d 755, 756 (5th Cir.1990). As a comprehensive statute designed to protect employee benefits, E.R.I.S.A. is to be liberally construed in favor of participants. *See, Kross v. Western Electric Co.*, 701 F.2d 1238 (7th Cir.1983). In light of the statute's remedial purposes, coverage should be extended to provide the maximum degree of protection to employees. *See, Nachman Corp. v. Pension Benefit Guaranty Corp.*, 592 F.2d 947 (7th Cir.1979), *affirmed*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980); *Eaves v. Penn*, 587 F.2d 453 (10th Cir.1978); *Connolly v. Pension Benefit Guaranty Corp.*, 581 F.2d 729, 732 (9th Cir.1978), *cert. denied*, 440 U.S. 935, 99 S.Ct. 1278, 59 L.Ed.2d 492 (1979).

5. In enacting the Federal Deposit Insurance Act, 12 U.S.C. § 1811 et seq., Congress empowered the FDIC to act with finality in many instances. After considering the language, legislative history, and structure and purpose of E.R.I.S.A. and the Federal Deposit Insurance Act, the Court is convinced that Congress did not intend to allow the FDIC to unilaterally decide to terminate the benefits of employees covered by an E.R.I.S.A. plan.

6. In enacting E.R.I.S.A., it was the intent of Congress to make applicable the law of trusts in view of the special nature and purpose of employee benefit plans. *See, e.g., Freund v. Marshall & Ilsley Bank*, 485 F.Supp. 629, 635 (W.D.Wis. 1979); and *Marshall v. Teamsters Local 282 Pension Trust Fund*, 458 F.Supp. 986, 990 (E.D.N.Y.1978). A fiduciary is duty-bound to inform its beneficiaries of important matters concerning the trust. Bogert, *Trusts and Trustees*, 2nd Ed.Rev'd § 961. This duty to supply information is codified in E.R.I.S.A., 29 U.S.C. §§ 1021 and 1024.

7. Participants are entitled to notice of material modifications in the plan. *See, Baker v. Lukens Steel Co.*, 793 F.2d 509 (3rd Cir.1986). Under the unique circumstances of this case, it was misleading for Bridge Bank widely to disseminate information that it was continuing the MCorp welfare benefit package without change if it did not in fact intend to provide coverage for a significant group of persons in fact covered by the MCorp welfare benefit package, those who had retired or become disabled before March 28, 1989. Bridge Bank was required to provide affirmative

notice of the change if Bridge Bank intended to effectuate the change.

■ 8. Once employee status is determined, an individual remains qualified as a member of a welfare plan even if on leave of absence, or working temporarily for another employer, acting as an independent contractor, terminated due to layoff, retirement or disability. Treas.Reg. 501(c)(9)–2b. Both the MEBA Welfare Plan and the Bridge Bank Welfare Plan provide coverage to former disabled employees. The terms "employee" or "employed by the company" are ambiguous and have been held to include service for the predecessor of the employer. *See, Landro v. Glendenning Motorways, Inc.,* 625 F.2d 1344 (8th Cir.1980).

■ 9. No determination was made under the Bridge Bank Welfare Plan, by the Bridge Bank Board, Benefits Committee, or Plan Administrator, to deny coverage to retired or disabled employees of the Failed Banks. Alternatively, any such determination by the Plan Administrator is set aside as arbitrary and capricious because predicated on the assumption that MCorp was liable as plan sponsor to such persons. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989).

10. E.R.I.S.A. requires that all participants of an E.R.I.S.A. plan be provided with an accurate description of their benefits in a summary plan description. E.R.I.S.A. Section 102, 29 U.S.C. § 1022. Regarding a *new* plan, participants must be provided with the summary plan description within 120 days of the effective date of the plan. 29 CFR 2520.104b–(2)(a).

> Any burden of uncertainty created by careless or inaccurate drafting of the summary must be placed on those who do the drafting, and who are most able to bear that burden, and not on the individual employee, who is powerless to affect the drafting of the summary or the policy and ill equipped to bear the financial hardship that might result from a misleading or confusing document.

*Hansen v. Continental Insurance Co.,* 940 F.2d 971, 982 (5th Cir.1991). An employer will be bound to the terms of its E.R.I.S.A. plan and held to its representations regarding the plan. *See, e.g., Monson v. Century Manufacturing Co.,* 739 F.2d 1293, 1302–1303 (8th Cir.1984).

■ 11. The MEBA Welfare Plan and the MEBA Trust contain bilateral obligations that are binding on Bridge Bank. *See, Howell v. Continental Credit Corp.,* 655 F.2d 743 (7th Cir.1981); *Federal Deposit Insurance Corp. v. McClanahan,* 795 F.2d 512, 515 (5th Cir.1986). By electing to become a participating employer in the MEBA Welfare Plan as a successor to the Failed Banks, Bridge Bank assumed the duties and responsibilities under the MEBA Welfare Plan and MEBA Trust to the participants of the Failed Banks, including their employees who had retired or became disabled before March 28, 1989.

12. A participating employer in a welfare benefit plan may not breach its terms nor interpret the plan in an arbitrary or capricious manner. *See, e.g.* E.R.I.S.A. § 404, 29 U.S.C. § 1104; *Policy v. Powell Pressed Steel Co.,* 770 F.2d 609 (6th Cir. 1985), *cert. denied,* 475 U.S. 1017, 106 S.Ct. 1202, 89 L.Ed.2d 315 (1986); *International Union, United Automobile Workers of America v. Cadillac Malleable Iron Co.,* 728 F.2d 807 (6th Cir.1984); *International Union, United Automobile Workers of America v. Yard–Man, Inc.,* 716 F.2d 1476 (6th Cir.1983), *cert. denied,* 465 U.S. 1007, 104 S.Ct. 1002, 79 L.Ed.2d 234 (1984).

■ 13. Principles of successorship liability apply in E.R.I.S.A. cases as well as in labor relation cases, Title VII cases, and Sec. 1981 cases. *Upholsterers Un. Pen. Fund v. Artistic Furniture,* 920 F.2d 1323, 1327 (7th Cir.1990). Bridge Bank is a "successor employer" to the Failed Banks respecting the MEBA Welfare Plan. *See, Equal Employment Opportunity Commission v. MacMillan Bloedel Containers, Inc.,* 503 F.2d 1086 (6th Cir.1974). *See also Golden State Bottling Co. v. National Labor Relations Board,* 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973); *Musikiwamba v. ESSI, Inc.,* 760 F.2d 740 (7th Cir.1985); *Bates v. Pacific Maritime Association,*

744 F.2d 705 (9th Cir.1984); *Trujillo v. Longhorn Manufacturing Co.*, 694 F.2d 221 (10th Cir.1982).

14. A successor who assumes or adopts a welfare benefits contract is bound by it. *National Labor Relations Board v. Pine Valley Division of Ethan Allen, Inc.*, 544 F.2d 742 (4th Cir.1976). *See also New England Mechanical, Inc. v. Laborers Local Union 294*, 909 F.2d 1339 (9th Cir.1990); *Audit Services, Inc. v. Rolfson*, 641 F.2d 757 (9th Cir.1981); *Cement Masons' Pension Trust Fund v. O'Reilly*, 664 F.Supp. 277 (E.D.Mich.1987). As a successor employer, Bridge Bank, together with the Bridge Bank Welfare Plan and Bridge Bank Trust, is responsible for the welfare benefits promised by the Failed Banks. *United Steelworkers of America v. Connors Steel Co.*, 855 F.2d 1499 (11th Cir. 1988). *cert. denied*, 489 U.S. 1096, 109 S.Ct. 1568, 103 L.Ed.2d 935 (1989). Bridge Bank has adopted and assumed the duties and responsibilities under the MEBA Welfare Plan and became and remains responsible to all participants of the Failed Banks, including those who retired or became disabled before March 28, 1989, and their beneficiaries.

15. E.R.I.S.A. makes it unlawful for an employer to discriminate against any participant or beneficiary for the purpose of interfering with the attainment of any right to which a participant may become entitled under the plan. 29 U.S.C. § 1140. *Gavalik v. Continental Can Co.*, 812 F.2d 834 (3rd Cir.), *cert. denied*, 484 U.S. 979, 108 S.Ct. 495, 98 L.Ed.2d 492 (1987); *Kross v. Western Electric Co.*, 701 F.2d 1238 (7th Cir.1983); *McLendon v. Continental Group, Inc.*, 602 F.Supp. 1492, 1499 (D.N.J. 1985). Bridge Bank's denial of coverage, and attempted denial of trust funds, for the benefit of retired and disabled employees of the Failed Banks contravenes the anti-discrimination provision of E.R.I.S.A..

16. Additionally, Bridge Bank's retention of the $693,318.54 and the $226,767.60 in funds made Bridge Bank a fiduciary and a party in interest with respect to the MEBA Trust and the MEBA Welfare Plan under Sections 3(14)(A) and (C) and 3(21) of E.R.I.S.A.

17. The Benefit Plan Litigation Agreement purported to give the FDIC the benefit of any recovery against the MEBA Trust. Performance of that Agreement would have violated the strict prohibition against the use of a VEBA's assets to benefit anyone other than the plan's participants and beneficiaries. 29 U.S.C. § 1106. *See also Sandoval v. Simmons*, 622 F.Supp. 1174 (C.D.Ill.1985).

18. Principles of equitable estoppel apply to claims under E.R.I.S.A. *See, Black v. TIC Investment Corp.*, 900 F.2d 112, 114 (7th Cir.1990); *Dockray v. Phelps Dodge Corp.*, 801 F.2d 1149, 1155 (9th Cir. 1986). *See also Hermann Hospital v. MEBA Medical & Benefits Plan*, 845 F.2d 1286 (5th Cir.1988) (remanding to determine whether the facts raised an estoppel of a health benefits plan).

19. Under the facts of this case, Bridge Bank is estopped to deny that it became a participating employer under the MEBA Welfare Plan; that the Bridge Bank Welfare Plan is a successor plan to the MEBA Welfare Plan; that the Bridge Bank Trust is a successor trust to the MEBA Welfare trust; and that it is responsible for Failed Bank participants who retired or became disabled before March 28, 1989. *See, e.g., Neiman–Marcus Group, Inc. v. Dworkin*, 919 F.2d 368 (5th Cir.1990); *Keado v. U.S.*, 853 F.2d 1209 (5th Cir.1988) and *FDIC v. Harrison*, 735 F.2d 408, 411 (11th Cir.1984).

20. MCorp's attempted May 5, 1989 Amendment to the MEBA Welfare Plan was outside the ordinary course of its business and could not have been effected without a bankruptcy court order granting relief after notice and an opportunity for a hearing. 11 U.S.C. § 363(b)(1); *In re James Phillips, Inc.*, 29 B.R. 391 (S.D.N.Y. 1983); *In re Waterfront Companies, Inc.*, 56 B.R. 31 (Bankr.D.Minn.1985).

21. The abuse of discretion standard of review is appropriate for the factual findings made by the MEBA Welfare Plan Administrator on the proper allocation of

MEBA Trust assets between participants of the MCorp entities and participants of the Bridge Bank. *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 115, 109 S.Ct. 948, 956–57, 103 L.Ed.2d 80 (1989); *Pierre v. Connecticut General Life Insurance Co.,* 932 F.2d 1552 (5th Cir.), *cert. denied,* ——— U.S. ———, 112 S.Ct. 453, 116 L.Ed.2d 470 (1991).

22. The MEBA Welfare Plan Administrator did not abuse his discretion in allocating the remaining assets of the MEBA Welfare Plan and the MEBA Trust between participants of the MCorp entities and the Bridge Bank participants. *Batchelor v. International Brotherhood of Electrical Workers Local 861,* 877 F.2d 441, 444 and n. 10 (5th Cir.1989).

23. An award of attorney's fees under E.R.I.S.A. is discretionary. Given E.R.I.S.A.'s remedial purpose of protection of employee rights, a plaintiff succeeding on any significant issue should be entitled to an award of attorney's fees. *See, Smith v. CMTA–IAM Trust,* 746 F.2d 587, 589 (9th Cir.1984). In *Iron Workers Local No. 272 v. Bowen,* 624 F.2d 1255, 1266 (5th Cir.1980), the court delineated several factors determining whether attorney's fees should be awarded to prevailing parties. Those factors are satisfied in the present case.

24. The court will enter a Final Judgment in this civil action, but will retain jurisdiction to determine attorney's fees. In determining the amount of attorney's fees, the Court will be guided by the factors set forth in *Johnson v. Georgia Highway Express, Inc.,* 488 F.2d 714, 717–719 (5th Cir.1974). Plaintiffs are directed to submit a detailed affidavit with supporting documentation in accordance with the *Johnson* factors within fifteen (15) days of the signing of the Judgment. The BANK ONE Defendants will have ten (10) days thereafter to file any controverting material.

25. Matters relating to control and supervision of trusts are within the equity jurisdiction of the Court. *In re A.H. Robins Co.,* 880 F.2d 769 (4th Cir.1989). The Court will also retain jurisdiction over the welfare benefit plans and trusts to ensure that the participants and beneficiaries of these trusts are protected.

26. The Court determines that there is no just reason for delay and expressly directs entry of Final Judgment herein. Rule 54(b), F.R.Civ.P.

FINAL JUDGMENT, DECLARATORY JUDGMENT AND DECREE INSTRUCTING TRUSTEE AND ADMINISTRATOR

This civil action was tried to the Court November 13, 14, and 15, 1991, on the Second Amended Complaint of Plaintiff Jimmy F. Taylor as the Administrative Committee (together with his successors, the "Committee"), and for and on behalf of the WELFARE PLAN OF MERCANTILE EMPLOYEE'S BENEFICIARY ASSOCIATION (the "MEBA Welfare Plan"), and Plaintiff AMERITRUST TEXAS, N.A., TRUSTEE of Mercantile Employees' Beneficiary Association Trust (the "MEBA Trust"). The Defendant BANK ONE, TEXAS, N.A., formerly known as Deposit Insurance Bridge, National Association ("Bank One"), the Defendant DEPOSIT INSURANCE BRIDGE BANK EMPLOYEE'S BENEFICIARY TRUST (the "Bridge Bank Trust"), the Defendant WELFARE PLAN OF BANK ONE, TEXAS, EMPLOYEES' BENEFICIARY ASSOCIATION (the "Bridge Bank Plan"), and the Defendant BANC ONE MORTGAGE COMPANY, TEXAS, formerly known as MBank Mortgage Company ("Banc One Mortgage") went to trial on their First Amended Answer. The Defendants MCORP, MCORP FINANCIAL, and MCORP MANAGEMENT together went to trial on their Answer. A Revised Pre-trial Order agreed to by the parties was submitted on November 5, 1991. The parties stipulated to dismissal of counts two and three of the Second Amended Complaint. There are no counterclaims or crossactions. The Court has separately made Findings of Fact and Conclusions of Law.

It is ORDERED.

(1) Effective March 28, 1989, Bank One became a participating employer under the terms of the welfare plan documents comprising the MEBA Welfare Plan and as such Bank One became and remains liable to the former employees (and their beneficiaries) of the hereinafter defined Failed Banks who retired or became disabled before March 28, 1989 (the "Subject Participants"). The "Failed Banks" are MBank Abilene, N.A., MBank Corsicana, N.A., MBank Dallas, N.A., MBank Marshall, N.A., MBank Mid Cities, N.A., MBank Wichita Falls, N.A., MBank Houston, N.A., MBank The Woodlands, N.A., MBank Denton County, N.A., MBank Orange, N.A., MBank Sherman, N.A., MBank Alamo, N.A., MBank Austin, N.A., MBank Brenham, N.A., MBank Odessa, N.A., MBank Round Rock, N.A., MBank Greenville, N.A., MBank Longview, N.A., MBank Fort Worth, N.A., and MBank Jefferson County, N.A. and their predecessors.

(2) The Bridge Bank Plan is a successor plan to the MEBA Welfare Plan respecting the Subject Participants and all employees of the Failed Banks who later became employed by Bank One, and as such the Bridge Bank Plan became and remains liable to the Subject Participants.

(3) The Bridge Bank Trust is a successor trust to the MEBA Trust respecting the Subject Participants and all employees of the Failed Banks who later became employed by Bank One, and as such the Bridge Bank trust became and remains liable to the Subject Participants.

(4) The Subject Participants have the same rights to receive benefits from Bank One, the Bridge Bank Plan, and the Bridge Bank Trust, as any employees of Bank One who were covered by the MEBA Welfare Plan or the Bridge Bank Plan and who retired or became disabled on or after March 28, 1989 (the "Bank One Participants"), and Bank One, the Bridge Bank Plan, and the Bridge Bank Trust are obligated not to discriminate against any Subject Participant and are obligated to extend welfare benefits to the Subject Participants on terms substantially equal to those extended to the Bank One Participants.

(5) Effective March 28, 1989, Bank One became and remains liable to make payment to the Bridge Bank Trust of all employer contributions due or to become due by the Failed Banks under the terms of the MEBA Welfare Plan.

(6) The Committee and the MEBA Trust are instructed to transfer to the Bridge Bank Trust all of the funds of the MEBA Welfare Plan and MEBA Trust allocable to the Subject Participants.

(7) The Committee and the MEBA Trust are instructed not to transfer to the Bridge Bank Trust, but to retain, all of the funds of the MEBA Trust allocable to employees or former employees (and their beneficiaries) of MEBA Welfare Plan employers other than the Failed Banks.

(8) The Bridge Bank Trust is instructed and is liable to hold and administer, for the exclusive benefit of the Subject Participants, all funds contributed by Bank One as successor to the Failed Banks and all funds transferred by the MEBA Trust.

(9) Bank One and the Bridge Bank Trust, as their interests may appear, are and shall be subrogated to any and all claims owned or held by the Committee, the MEBA Welfare Plan, the MEBA Trust, the Subject Participants, or any of them, against the Failed Banks or the Federal Deposit Insurance Corporation as Receiver for the Failed Banks to the extent such claims are actually paid by Bank One or the Bridge Bank Trust, as their interests may appear.

(10) The Court reserves and retains jurisdiction to determine the amount of attorney's fees, costs, and expenses to be awarded to the Plaintiffs under Section 502(g) of the Employee Retirement Income Security Act. The Court expressly determines under Rule 54(b), F.R.Civ.P., that there is no just reason for delay and expressly directs entry of this Judgment. The amount of such fees, costs, and expenses shall be determined on motion filed within thirty (30) days after entry of this Judgment. Such filing shall comply with the format established in *Johnson v. Georgia Highway Express, Inc.*, 488 F.2d 714 (5th Cir.1974).

(11) No relief has been requested or is granted respecting Banc One Mortgage.

(12) No relief has been requested or is granted respecting MCorp, MCorp Financial, or MCorp Management.

(13) Except as expressly stated in this Judgment, all relief requested is DENIED.

IT IS SO ORDERED.

THIS IS A FINAL JUDGMENT.

## ORDER ON MOTION TO AMEND OR ALTER JUDGMENT

Before the Court is the Motion of the Defendants Bank One, Texas, N.A. ("Bank One"); Deposit Insurance Bridge Bank Employees' Beneficiary Association; Welfare Plan of Bank One, Texas, Employees' Beneficiary Association; and Banc One Mortgage Company, Texas, f/d/a MBank Mortgage Company (collectively the "Bank One Defendants"), to Amend or Alter Judgment, and Alternative Motion for Stay Pending Appeal. For the reasons stated below, the Motion to Amend or Alter Judgment is GRANTED IN PART and DENIED IN PART and the Motion for Stay is DENIED.

## I. MODIFICATION OF JUDGMENT

Paragraph 8 of this Court's previous Order of Declaratory Judgment is stricken, and the following language is substituted in its place:

> The Bridge Bank Trust is instructed and is liable to hold and administer, for the exclusive benefit of the Subject Participants and the three individual Bank One Participants who became disabled before January 1, 1990, all funds contributed by Bank One as successor to the Failed Banks and all funds transferred by the MEBA Trust.

## II. BANK ONE DEFENDANTS HAVE VIOLATED SECTION 510 OF ERISA

The Bank One Defendants' attempt to narrow the terms of section 510 of Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1001 *et seq.*, is contrary to the statute's plain language. Section 510 prohibits a broad range of conduct by any "person" when such conduct is directed against an ERISA plan "participant" for the purpose of interfering with the attainment of any ERISA right. The prohibited conduct includes discrimination against participants which affects their ability to receive benefits which have not yet vested, but which they may become entitled to under the plan. The term "participant" includes former employees. 29 U.S.C. § 1002(7). Moreover, section 510 clearly applies to health benefits as well as pension benefits. *See, e.g., Kross v. Western Elec. Co.*, 701 F.2d 1238, 1242–43 (7th Cir.1983). Thus, Bank One's attempt to disavow any duty to provide benefits to the former employees who were employed by the MBanks that were declared insolvent on March 28, 1989 (the "Failed Banks") and who retired or became disabled before March 28, 1989 (the "Subject Participants") while providing benefits for the employees of Bank One who were covered by the Mercantile Employees' Beneficiary Association Trust Welfare Plan or the Bridge Bank Plan and who retired or became disabled on or after March 28, 1989 (the "Bank One Participants") runs afoul of section 510.

## III. CASE LAW DOES NOT REQUIRE THE COURT TO ALTER JUDGEMENT

The Bank One Defendants argue that controlling Fifth Circuit case law requires the Court to alter or amend its judgment. It does not. In *McGann v. H & H Music Co.*, 946 F.2d 401 (5th Cir.1991), the court held that an employer could reduce the lifetime maximum benefit available for Acquired Immune Deficiency Syndrome ("AIDS") claims from $1,000,000.00 to $5,000.00. While this affected only those plan members who wished to make AIDS related claims, and thus, in a sense, "discriminated" against those plan members with AIDS, *the change applied to all plan members.* By contrast in the instant case, Bank One has not attempted to apply a uniform change to all ERISA plan participants. Rather, it has attempted to exclude

the Subject Participants entirely, while still providing benefits to the Bank One Participants. *McGann* does not sanction such activity. Indeed, *McGann* makes it clear that section 510 prohibits discrimination "motivated by a desire ... to deprive an employee of an existing right to which he may become entitled." *Id.* at 408.

## IV. BANK ONE DEFENDANTS ARE NOT ENTITLED TO A STAY PENDING APPEAL

### A.

■ Courts usually consider four criteria to determine whether to grant extraordinary relief such as a stay pending appeal: (1) whether the movant has made a showing of likelihood of success on the merits; (2) whether the movant has made a showing of irreparable injury if the stay is not granted; (3) whether the granting of the stay would substantially harm the other parties; and (4) whether the granting of the stay would serve the public interest.

*In re First South Sav. Ass'n*, 820 F.2d 700, 709 (5th Cir.1987) (stay pending bankruptcy appeal). *See also United States v. Federal Deposit Insurance Corp.*, 881 F.2d 207, 210 (5th Cir.1989) (preliminary injunction), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990).

In the instant case, at least three of these factors are weighted against the Bank One Defendants. First, for the reasons stated in this Court's previous Order of Declaratory Judgment and in this Order, the Court concludes that the Bank One Defendants have not demonstrated a likelihood of success on the merits. Second, the record indicates that the Federal Deposit Insurance Corporation ("FDIC") will indemnify the Bank One Defendants for the costs of this action and for any liability incurred. Finally, the record indicates that the granting of a stay would substantially harm the other parties. MCorp is in Chapter 11 Bankruptcy and has only a minuscule staff available to administer benefits to the Subject Participants. Likewise, Plaintiffs are unable to administer benefits

to the Subject Participants during the pendency of appeal. If the stay is granted, the Subject Participants will be left without any benefits during the pendency of the appeal.

### B.

■ The Bank One Defendants, however, argue that 12 U.S.C. § 91 requires this Court to stay its judgment pending appeal. Section 91 provides that "no attachment, injunction, or execution, shall be issued against [a national bank] or its property before final judgment in any suit, action, or proceeding...." While it is true that "a non-restrictive reading of Section 91 is necessary to effectuate the statutory purpose...." *United States v. Federal Deposit Insurance Corp.*, 881 F.2d 207, 210 (5th Cir.1989), *cert. denied*, 493 U.S. 1072, 110 S.Ct. 1118, 107 L.Ed.2d 1025 (1990), there is nothing to suggest section 91 requires that a *declaratory judgment* must necessarily be stayed pending appeal.

Moreover, it is clear that the purpose of section 91 is to prevent "the premature, and potentially fatal, seizure of assets of an operational bank .. and the securing of substantial assets essential to a fair and equitable dispersal to creditors of a failed bank...." *United States v. Lemaire*, 826 F.2d 387, 390 (5th Cir.1987), *cert. denied*, 485 U.S. 960, 108 S.Ct. 1223, 99 L.Ed.2d 423 (1988). In the instant case there is no evidence that the failure to stay this Court's judgment pending appeal will in any way undermine such purpose. Because the FDIC is paying for the defense of this action and will pay any judgment, the failure to grant a stay pending appeal will in no way affect the assets available for payment of Bank One's creditors. Additionally, the judgment gives Bank One tremendous flexibility with respect to the Bridge Bank Welfare Plan and Trust. While Bank One is obligated to fund benefits on behalf of the Subject Participants, it is free to modify the plan as long as it does not do so in a discriminatory manner. Therefore, the Court concludes that 12

U.S.C. § 91 does not require it to grant a stay pending appeal.

Finally, there is nothing to indicate that section 91 applies to parties who are not national banks. Therefore, even assuming the Bank One Defendants' other arguments are correct, the Court should not grant a stay as regards the two nonbank Defendants: the Bridge Bank Welfare Plan and Bridge Bank Trust.

### C.

■ Finally, the Bank One Defendants argue that the Court should grant a stay pending appeal to preserve the status quo. In general, the Court feels that maintaining the status quo is a sound policy. It is not, however, the only factor to be consider in determining whether to grant a stay. *Cf. United States v. FDIC, supra.* The granting of a stay would be of only slight benefit to the Bank One Defendants; it might well prove to be catastrophic to the Plaintiffs.

It is therefore ORDERED, ADJUDGED, and DECREED that this Court's previous Order of Declaratory Judgment is hereby MODIFIED such that it is consistent with Part I of this Order.

It is further ORDERED that the Court's previous Order of Declaratory Judgment is otherwise AFFIRMED.

It is further ORDERED that the Bank One Defendants' Motion for Stay Pending Appeal is hereby DENIED.

IT IS SO ORDERED.

THIS IS A FINAL JUDGMENT.