**Paul E. KLEBE, et al., Plaintiffs,**

v.

**MITRE GROUP HEALTH CARE PLAN, Defendant.**

Civ. No. PJM 92–3130.

United States District Court,
D. Maryland,
Southern Division.

Aug. 17, 1995.

---

James P. Koch, Tracey Gann Turner, Piper & Marbury, Baltimore, MD, for plaintiffs.

David O. Stewart, Ropes and Gray, Washington, DC, Gil A. Abramson, Hogan & Hartson, Baltimore, MD, for defendant.

*OPINION*

MESSITTE, District Judge.

Paul E. and Carol J. Klebe, both employed by MITRE Corporation, bring this ERISA action on behalf of their son John, challenging a denial of benefits under MITRE's self-insured Group Health Plan (the Plan). *See* 29 U.S.C. § 1132(a)(1)(B). The benefits in

question pertain to care provided John at Chestnut Lodge Hospital, a private psychiatric hospital in Rockville, Maryland. MITRE contends that John, who has been diagnosed as a chronic paranoid schizophrenic, has reached his $500,000 lifetime mental health treatment maximum under the Plan. The Klebes argue that schizophrenia is a medical condition and that treatment for John's condition should be covered under the Plan's $1,000,000 lifetime medical treatment maximum. Both sides have moved for summary judgment.[1] For the following reasons, the Court grants the Motion of Defendant MITRE and denies those of Plaintiffs.

## I.

At age five, John Klebe was diagnosed with polycystic kidney disease. The condition required multiple surgeries including, when John was twelve, the removal of a kidney and the construction of an ileoconduit with ureterostomy. When he was in second grade, John began seeing a psychiatrist, a Dr. Briscoe, whom he continued to consult throughout his youth. John worried about being separated from his parents and had trouble dealing with what he considered to be humiliating kidney problems including improper drainage from his remaining kidney and incontinence. Although he adjusted somewhat to junior high school, by ninth grade John reported that his peers picked on him because he was much smaller than they were. When John began high school, he seemed to adjust to his new surroundings until a car killed his cat, after which he refused to attend school. Dr. Briscoe worked with John regarding his fear of attending school and John gradually returned, but in the first week of his junior year he suffered another setback, developing a hydrocele on his testicle which required surgery. After the surgery John again refused to attend school.

John's first psychiatric hospitalization, at the Psychiatric Institute of the District of Columbia, occurred in August 1986, following his aborted junior year. The hospitalization was brought on by John's marked depression and increasingly erratic behavior. At the Psychiatric Institute, John was treated with anti-psychotic and anti-depressant medications and his psychosis abated. After two months, however, John was transferred to the Cumberland Hospital in New Kent, Virginia, for treatment of his residual personality disorder and management of his medical condition involving the ureteral diversion with the ileoconduit. Unable to receive extensive psychotherapy at Cumberland, John was transferred to Chestnut Lodge at the end of January, 1987, upon recommendation of Dr. Briscoe. In December, 1989, John's parents were informed that his diagnosis was "schizophrenia, paranoid type, chronic."

Over the years John received various medications in connection with his schizophrenia including Trilafon, Symmetral, Ativan, Retin A, Cleosin, and Tylenol. Throughout, John also participated in intensive psychotherapy, group therapy, milieu therapy, and family therapy. Additionally, towards the end of his stay at Chestnut Lodge, John and his therapist took drives together in the community, ate lunch together once a week in the cafeteria, and engaged in occasional physical activities, including walks and tossing a softball. During this period, John held a volunteer and eventually a paid position at the local library. He also worked in the hospital's dietary and cash offices. His therapist observed that "(John) should be able to achieve gainful employment on a part-time basis," but cautioned "that John will need ongoing supervised living situations as well as ongoing therapy for his chronic schizophrenia over several years. His medical condition will also need to be monitored throughout his lifetime."

At the time this suit was filed, John was 24 years old.

## II.

The Plan provides coverage to its participants under two separate lifetime benefit maximums as follows:

---

**1.** Chestnut Lodge Hospital, as co-Plaintiff, has filed its own Motion for Summary Judgment in addition to that filed by the Klebes.

Lifetime Maximum Benefits

In addition to maximums for certain types of benefits specified elsewhere in this description of the [Plan], there is a lifetime medical maximum of $1,000,000 per person for both the high and low option plans. There is a separate lifetime mental health benefit maximum of $500,000 per plan for the high option and $100,000 for the low option plan....

Mental Health Treatment

The [Plan] provides the same level of benefits for inpatient mental health treatment as for other illnesses.... however, the lifetime maximum benefit per covered individual for all mental health, substance abuse and drug dependency treatment, inpatient and outpatient, is $500,000 for the high option plan....

The "Mental Health" section of the Plan includes provisions for the treatment of "mental, psychoneurotic, or personality disorder." Within the "Mental Health" section, "consulting, diagnostic, and treatment sessions by a licensed.... psychologist, or psychiatrist" are covered under "Outpatient Mental Health Treatment."

Paul Klebe carries the High Option Plan, which also covers John.[2]

According to Carolyn Brownawell, MITRE's Director of Corporate Compensation and Benefits, past practice under the Plan has been to charge expenses for intensive psychotherapy, individual therapy, group therapy, family therapy and milieu therapy against a beneficiary's mental health lifetime maximum regardless of the nature or cause of the illness. This has been true not only with respect to John Klebe, but for all other plan participants. Carol Klebe, moreover, concedes that she directed Chestnut Lodge to file separate claims for John, one for all his psychological related charges and another for medications related to his kidney condition. She did this, she says, because of the division between "MITRE's medical and psychiatric" categories.

In May 1992, having been notified by the Plan that John's $500,000 mental health max-

imum had been reached, the Klebes sought to have his diagnosed condition of "paranoid schizophrenia" covered under the $1,000,000 lifetime medical benefit maximum instead of the $500,000 lifetime mental health benefit maximum. They argued that, since John's condition was biological in nature, it required at least some medical treatment and was therefore assignable to that category of coverage.

When the Klebe's ERISA review resulted in an unfavorable decision, this litigation followed.

### III.

■ Rule 56 of the Federal Rules of Civil Procedure provides that a motion for summary judgment must be granted if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 2552–53, 91 L.Ed.2d 265 (1986). Genuine issues of material fact cannot be created through mere speculation. *See Beale v. Hardy,* 769 F.2d 213, 214 (4th Cir.1985). Moreover, "[f]actual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

### IV.

In *Doe v. Group Hospitalization and Medical Services,* 3 F.3d 80 (4th Cir.1993), the United States Court of Appeals for the Fourth Circuit discussed the standards of review to be applied in cases challenging the denial of benefits under ERISA:

Court actions challenging the denial of benefits under 29 U.S.C. § 1132(a)(1)(B) are subject to the standard of review announced in *Firestone Tire and Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989). The Court observed there, deriving guidance from principles of trust law, that in reviewing actions of a fiduciary who has been given discretionary

---

**2.** Carol Klebe, as an employee of MITRE, has coverage under the Plan in her own right. In Count I of this suit she sought to invoke an additional $500,000 in medical coverage for

John under her separate plan but, for reasons apart from those discussed here, the Court granted MITRE's motion for summary judgment with respect to that claim.

powers to determine eligibility for benefits and to construe the language of an ERISA plan, deference must be shown, and the fiduciary's actions will be reviewed only for abuse. *Id.* at 111, 109 S.Ct. at 954. If discretionary authority is not provided, denials of claims are to be reviewed *de novo. Id.* at 115, 109 S.Ct. at 956; *see also de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1187 (4th Cir.1989) (considering when a plan confers discretion). Thus, where a fiduciary with authorized discretion construes a disputed or doubtful term, we will not disturb the interpretation if it is reasonable, even if we come to a different conclusion independently. *See Firestone,* 489 U.S. at 115, 109 S.Ct. at 956; *Holland v. Burlington Indus. Inc.,* 772 F.2d 1140, 1149 (4th Cir.1985) (the courts may not replace a reasonable interpretation by a trustee with discretion with an interpretation of their own), *cert. denied,* 477 U.S. 903, 106 S.Ct. 3271, 91 L.Ed.2d 562, *and aff'd mem. sub nom. Brooks v. Burlington Industries,* 477 U.S. 901, 106 S.Ct. 3267, 91 L.Ed.2d 559 (1986). In *Firestone,* however, the Supreme Court went on to recognize that a conflict of interest could lower the level of deference to be applied to a discretionary decision by a fiduciary:

> Of course, if a benefit plan gives discretion to an administrator or fiduciary who is operating under a conflict of interest, that conflict must be weighed as a "facto[r] in determining whether there is an abuse of discretion."

489 U.S. at 115, 109 S.Ct. at 957 (quoting Restatement (Second) of Trusts § 187 comment d (1959)).

3 F.3d at 85.

The *Doe* court went on to hold that:

> ... when a [conflicted] fiduciary exercises discretion in interpreting a disputed term of the contract where one interpretation will further the financial interests of the fiduciary, we will not act as deferentially as would otherwise be appropriate. Rather, we will review the merits of the interpretation to determine whether it is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries. In short,

the fiduciary decision will be entitled to some deference, but this deference will be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict.

3 F.3d at 87.

## V.

There is no question that the Plan in this case confers discretion upon the Plan Administrator and its Agent with regard to determining eligibility for benefits. While it is true that the language of discretion appears in an administrative services agreement (ASA) between MITRE and Equicor, a wholly owned subsidiary of Connecticut General Life Insurance Company (CIGNA), the Court accepts that a requisite grant of discretion may be derived from any number of plan documents, including the plan itself, summary descriptions, contracts, and the like. *See Doe v. Group Hospitalization & Medical Services,* 3 F.3d 80 (4th Cir.1993) (group insurance agreement); *Exbom v. Central States, SE and SW Areas Health & Welfare Fund,* 900 F.2d 1138 (7th Cir.1990) (trust agreement); *St. Mary Medical Center v. Cristiano,* 724 F.Supp. 732 (C.D.Cal.1989) (agreement and declaration of trust); *see also Taylor v. Bank One, N.A.,* 137 B.R. 624, 629 (S.D.Tex.1992), *rev'd on other grounds,* 992 F.2d 324 (5th Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 546, 126 L.Ed.2d 448 (1993) ("Other plan documents" included.... the July 1, 1984, administrative services agreement). Under the ASA, Equicor acts as the Claims Administrator for the Plan and has "final discretion as to the determination of the extent of benefits to which a claimant is entitled under the plan." Beyond that, a corporate Vice–President of MITRE, as Plan Administrator, has discretion to determine eligibility for benefits "in the event the company determines that Equicor has misinterpreted the plan and so informs Equicor in writing of the appropriate interpretation and such interpretation is deemed not unreasonable to Equicor." This language confers discretion sufficient to implicate review for abuse of discretion. *See de Nobel v. Vitro Corp.,* 885 F.2d 1180, 1187 (4th Cir.1989) ("no magic words" necessary to confer discretion);

*Boyd v. Trustees of UMWA Health and Retirement Funds,* 873 F.2d 57, 59 (4th Cir. 1989) (sufficient discretion conferred where trustees had power to make "full and final determination" as to eligibility); *Madden v. ITT Long Term Disability Plan,* 914 F.2d 1279, 1283–84 (9th Cir.1990) (administrator with discretionary authority may delegate authority to another fiduciary).

■ There remains, however, the question of whether MITRE is operating under a conflict of interest so as to lessen the deference to be accorded its decision-making. The Court concludes that such a conflict exists. In attempting to argue that it is not conflicted, MITRE blurs the essential facts. Again, the ASA clearly sets out that not only is a MITRE Vice–President the Plan Administrator, but also that MITRE has a considerable degree of final discretion to decide the extent of benefits to which a claimant is entitled. *See Horan v. Kaiser Steel Retirement Plan,* 947 F.2d 1412 (9th Cir.1991) (less deference due where employer administers plan); *Callahan v. Rouge Steel Co.,* 941 F.2d 456 (6th Cir.1991) (same). Moreover, whether CIGNA lacks a financial incentive to deny benefits, as MITRE claims, is of little consequence. It is MITRE's financial incentive that matters. The Plan in question is self-funded. Every dollar of benefit the Plan denies to a beneficiary is a dollar in the MITRE till. *Cf. Brown v. Blue Cross and Blue Shield of Alabama,* 898 F.2d 1556 (11th Cir.1990), *cert. denied,* 498 U.S. 1040, 111 S.Ct. 712, 112 L.Ed.2d 701 (1991) (less deference where claims decision made by insurer paying claims out of own assets). The conflict could hardly be more apparent. On these facts, the Court concludes that MITRE's decision denying benefits is entitled to less deference than would be the case if it faced no conflict of interest.[3]

## VI.

It is one thing to posit that a less deferential standard should be applied to the fiduciary's determination; it is quite another to determine precisely what the standard means and how it should be applied.

The Fourth Circuit has not squarely addressed the issue. In *Doe,* which applied the less deferential standard, the court simply found the Plan Administrator's decision incorrect and reversed, *i.e.* substituted its own judgment, citing among other things rules of contract interpretation which hold that ambiguities should be construed against the drafter. *See* 3 F.3d at 88–89. In another case, the Eleventh Circuit, finding the conflicted decisionmaker's determination to have been correct and made in good faith, upheld the determination notwithstanding the conflict. *See Anderson v. Blue Cross/Blue Shield of Alabama,* 907 F.2d 1072 (11th Cir.1990). On another occasion, the Eleventh Circuit, finding the conflicted decisionmaker's determination reasonable but disagreeing with it, remanded the case for further hearing at which the fiduciary was required to explain how, notwithstanding the conflict, the decision it reached would serve the interest of all the beneficiaries and participants in the plan. *Brown v. Blue Cross and Blue Shield of Alabama, supra.*

■ Taken together, these cases suggest the following rule: Whenever the less deferential standard applies, a court may substitute its own judgment if it disagrees with the conflicted decisionmaker, even if the decisionmaker's determination is reasonable. However, the court may give latitude to that decisionmaker to demonstrate that its determination was not only reasonable, but appropriate, *i.e.* that the decision was in the interest of all the participants in the plan. Under the same standard, if the court believes the decision both reasonable and correct, it may simply affirm the decision notwithstanding the conflict.

Cases from the Eleventh Circuit, which appears to have addressed the matter in greater detail than other circuits, tend to validate this distillation. The principal case is *Brown v. Blue Cross and Blue Shield of Alabama, supra.* In *Brown,* the Eleventh

---

**3.** MITRE contends that, because it is a non-profit corporation reimbursed for plan costs by the Federal Government, it is somehow immunized from conflict of interest. This proposition is not only doubtful, but irrelevant.

Circuit viewed the conflicted decisionmaker problem as essentially one of burden-shifting:

> In accordance with the foregoing common law principles, we hold that when a plan beneficiary demonstrates a substantial conflict of interest on the part of the fiduciary responsible for benefits determinations, the burden shifts to the fiduciary to prove that its interpretation of plan provisions committed to its discretion was not tainted by self-interest. That is, a wrong but apparently reasonable interpretation is arbitrary and capricious if it advances the conflicting interest of the fiduciary at the expense of the affected beneficiary or beneficiaries unless the fiduciary justifies the interpretation on the ground of its benefit to the class of all participants and beneficiaries. (Footnote omitted)

898 F.2d at 1566–67.

But the critical language in *Brown*, at least for present purposes, appears at Footnote 12:

> It is fundamental that the fiduciary's interpretation first must be "wrong" from the perspective of de novo review before a reviewing court is concerned with the self-interest of the fiduciary. *See, e.g., Denton v. First Nat'l Bank of Waco,* 765 F.2d 1295, 1304 (5th Cir.1985) (first step in application of arbitrary and capricious standard is determining legally correct interpretation of disputed plan provision), *cited with approval in Jett* [v. Blue Cross & Blue Shield of Ala.], 890 F.2d [1137] at 1139 [ (11th Cir.1989) ].

*Id.* at n. 12.

The notion of commencing the less deferential review from a "de novo perspective" was reaffirmed by the Eleventh Circuit in *Anderson v. Blue Cross/Blue Shield of Alabama,* 907 F.2d at 1076 ("Practically, we first must determine the legally correct plan interpretation; then, if HMG has interpreted the contract differently, we must ascertain whether HMG was arbitrary and capricious in using a different interpretation"). In *Brown,* questioning if not outright disagreeing with the correctness of the decisionmaker's determination, the court reversed and remanded in order to have the decisionmaker justify its decision. In *Anderson,* agreeing

with the correctness of the underlying decision, the court simply affirmed. But what the court effectively did first in *Anderson* was to find the fiduciary's interpretation "correct" from the perspective of de novo review, just as *Brown* had indicated it should. There was no need, in contrast to the situation in *Brown,* to move to the next level of inquiry where the fiduciary would be required to justify its interpretation on the ground of benefit to the class of all participants and beneficiaries.

This Court chooses to follow the lead of the Eleventh Circuit, and thus consider first, "from the perspective of de novo review," *Brown,* 898 F.2d at 1566, n. 12, whether MITRE's decision to deny John Klebe's coverage under his lifetime medical benefit limitation was correct. If the decision is judged incorrect but reasonable, the Court may find it necessary to proceed to the self-interest analysis; if, however, the Court judges the decision reasonable and correct, the inquiry will be at an end.

As the Court now explains, inasmuch as the Court believes that MITRE's decision to deny coverage was both reasonable and correct, there is no need to proceed beyond the first level of inquiry.

## VII.

■ Considering the case from the de novo perspective suggested in *Brown,* the Court applies ordinary principles of contract law. *Glocker v. W.R. Grace & Company,* 974 F.2d 540, 544 (4th Cir.1992). These principles require the Court to enforce the policy's plain language in its ordinary sense and to construe ambiguous terms against the drafter if they are not clarified by extrinsic evidence of the parties' intent. *Id.* While MITRE contends that the Plan "unquestionably" bases coverage on the type of treatment received, *i.e.* "mental health treatment," and not the type of illness suffered, the Court accepts for present purposes, as it did at oral argument, that the term "mental health treatment" is ambiguous. *Cf. Patterson v. Hughes Aircraft Co.,* 11 F.3d 948, 950 (9th Cir.1993); *Phillips v. Lincoln Nat'l Life Ins. Co.,* 978 F.2d 302, 308–10 (7th Cir.1992).

Plaintiffs suggest, however, that once such ambiguity is found, they must necessarily prevail, relying on the traditional rule of "contra proferentem" which they say requires that ambiguous terms of a benefit plan be construed against the drafter of the plan. *See, e.g., Kunin v. Benefit Trust Life Insurance Company,* 910 F.2d 534, 539 (9th Cir.1990), *cert. denied,* 498 U.S. 1013, 111 S.Ct. 581, 112 L.Ed.2d 587 (1990), *cited with approval in Doe,* 3 F.3d at 89. Defendant's response is that the rule of contra proferentem is a rule of last resort, that a court's obligation is to construe ambiguous terms against the drafter *only if they are not clarified by extrinsic evidence of the parties' intent.* In this the Court finds Defendants entirely correct, since what they posit is no more than the clear holding of *Glocker,* 974 F.2d at 544, recently reaffirmed *en banc* by the Fourth Circuit in *Hardester v. Lincoln Nat'l Life Ins. Co.,* 52 F.3d 70 (1995), adopting the dissent in 33 F.3d 330, 337–340 (4th Cir.1994). A recent opinion from the Second Circuit is in accord:

> Moreover, despite any interpretive presumption favoring the insured, an insurer may seek to overcome that presumption with probative evidence. *See* Stephen L. Liebo, 13 *Appleman's Insurance Law and Practice* § 7403, at 75 (Supp.1993) ("Where a policy is ambiguous, grounds, including appropriate extrinsic evidence, may be found to show that the interpretation unfavorable to an insured was the one reasonably understood by both parties; it is only when the ambiguity still remains after the resort to such extrinsic evidence that an ambiguous provision is to be construed against the insurer.").

*Hughes v. Boston Mut. Life Ins. Co.,* 26 F.3d 264, 270, n. 6 (1st Cir.1994); *see also Taylor v. Continental Group,* 933 F.2d 1227, 1233–34 (3rd Cir.1991) ("[w]e do not adopt a rule that would construe ambiguities against the drafter without first attempting to ascertain the intent of the parties"); *Harnischfeger Corporation v. Harbor Insurance Company,* 927 F.2d 974, 976 (7th Cir.1991), *cert. denied,* 502 U.S. 864, 112 S.Ct. 189, 116 L.Ed.2d 150 (1991). ("Rules of interpretation are tiebreakers ..."). While other courts may choose to bypass extrinsic evidence of intent and make presumptions directly in favor of the insured, *see e.g. Kunin v. Benefit Trust Life Ins. Co., supra,* the Fourth Circuit does not appear to have followed that course and neither will this Court. Accordingly the next appropriate step is to consider the extrinsic evidence, if any, of the parties' intent.

## VIII.

The uncontroverted extrinsic evidence, as the Court views it, confirms the reasonableness and the correctness of MITRE's interpretation of the Plan's language. According to the affidavit of Carolyn Brownawell, MITRE's Director of Corporate Compensation and Benefits:

> The plan pays benefits for mental health treatment based on the type of treatment provided. Benefits for all psychiatric treatment, including but not limited to intensive psychotherapy, individual therapy, group therapy, family therapy, and milieu therapy have been paid against the beneficiary's mental health lifetime maximum benefit for John Klebe and for all other beneficiaries who have received the same or similar treatment.

Plaintiffs offer no counter evidence to this, asserting only that MITRE has never had to classify schizophrenia as a "mental health problem." But speculation such as this hardly suffices to raise a genuine issue of material fact. *See Beale v. Hardy,* 769 F.2d at 214.

In addition to past practice, the Court, in probing the intent of the parties, may consider how the Plan has in fact been understood by them. *See Taylor v. Continental Group,* 933 F.2d at 1232–33. Carol Klebe concedes that she instructed Chestnut Lodge to separate the family's claims between John's "psychological related charges" and his "kidney related charges." She admits she did this because of the division between "MITRE's medical and psychiatric" categories. Only *after* they were notified that John had exhausted his personal lifetime mental health treatment maximum did the Klebes suggest that John's condition should be covered under the lifetime medical maximum. These facts indicate, and do so quite forcefully, that Plaintiffs themselves under-

stood the language of the Plan to mean precisely what Defendant says it means, *i.e.* that coverage applies to a type of treatment, not a type of condition.

Nor is this construction in any sense unreasonable. Judge Joseph H. Young of this Court, in *Saah v. Contel Corp.,* 780 F.Supp. 311 (D.Md.1991), *aff'd,* 978 F.2d 1256 (4th Cir.1992) (unpublished opinion), confronted a situation strikingly similar to the present case. In *Saah,* plaintiff, whose son suffered from an organic mood disorder, sought coverage under a medical as opposed to a psychiatric benefit limit. Granting summary judgment, Judge Young upheld the plan administrator's interpretation denying coverage. Although he employed an abuse of discretion standard, Judge Young ultimately found the decisionmaker's determination to have been not only reasonable but correct, which would also have satisfied the less deferential standard. ("Defendant's reason for basing benefit determinations on the treatment received is rational on its own merits and is supported by the plain language of the Plan." 780 F.Supp. at 318.) In particular, Judge Young noted that "the distinction between psychiatric treatment and medical treatment is 'well recognized in the managed care and employee benefit industries.'" 780 F.Supp. at 315. In the present case, MITRE points out why, in all probability, this distinction makes sense. It is undoubtedly far easier to identify the nature of particular treatment given, *i.e.* psychiatric or medical, than it is to identify the etiology of a particular disorder, especially to the extent that the disorder may derive from both organic and inorganic causes. A plan that ties benefits to the nature of the treatment is thus likely to operate more certainly and efficiently. The Court thus concludes that MITRE's Plan's focus upon the nature correct.[4] In consequence, there is no need to recur to the rule' of contra proferentem. Whatever initial ambiguity inheres in the language of the plan has been clarified by the extrinsic evidence,

the net result of which is to justify the interpretation given by MITRE.

The Court will therefore grant Defendant MITRE's Motion for Summary Judgment and deny those of Plaintiffs, the Klebes and Chestnut Lodge Hospital.

A separate Order will be entered implementing this decision.

---

**4.** At the Court's request, the parties submitted affidavits of various medical professionals concerning the biological nature *vel non* of paranoid schizophrenia. While profoundly interesting, the affidavits are ultimately not probative of the meaning, ordinary or otherwise, of any Plan terms; accordingly they "will not be counted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 248, 106 S.Ct. at 2510; *see also Phillips v. Lincoln Nat'l Life Ins. Co.,* 978 F.2d at 308.