**Jeanette HINES, Plaintiff**

v.

**UNUM LIFE INSURANCE COMPANY OF AMERICA, Defendant.**

**No. CIV.A. 99CV00174.**

United States District Court,
W.D. Virginia,
Abingdon Division.

Aug. 11, 2000.

John M. Lamie, Abingdon, VA, for Plaintiff.

William F. Rutherford, Jr., Powell M. Leitch, III, Roanoke, VA, for Defendants.

## MEMORANDUM OPINION AND ORDER

GLEN M. WILLIAMS, Senior District Judge.

## I INTRODUCTION

This case is before the court on cross motions for summary judgment. At issue here is entitlement to disability benefits under a Group Long Term Disability Policy issued by the Defendant, Unum Life Insurance Company. The Employee Retirement Income Security Act [ERISA], 29 U.S.C.A §§ 1001–1461 (West 1999), exclusively governs disputes involving employer-provided employee welfare plans, like the disability plan here.

The Plaintiff, Jeanette Hines, avers that Unum wrongfully denied her benefits initially, and wrongfully refused thereafter to fully and fairly review her claim in upholding the previous denial. Unum, however, claims that Hines's condition did not meet the policy's definitional preconditions for "total disability."

This court shall grant summary judgment if it is clear from the record that there are no genuine issues as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). In its examination of the record, the court must view all factual inferences in a light most favorable to the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The non-moving party does have a duty here however; any alleged disputes must be reasonable. *Sylvia Dev. Corp. v. Calvert County Md.*, 48 F.3d 810, 818 (4th Cir.1995).

As set forth by its reasoning below, the court denies the Defendant's motion and grants the Plaintiff's motion. The record before the court showcases a scathing fail-

ure by Unum Insurance to impartially administer the disability plan. Furthermore, the record contains a plethora of evidence supporting Ms. Hines's claim and scant evidence to the contrary. In addition to disability benefits, the court awards to Ms. Hines reasonable attorneys' fees and costs, as well as pre- and post-judgment interest on the amount owed dating from the initial claim for disability. The court finds that this result best effectuates the goals of ERISA and the proper administration of justice.

## II STATEMENT OF THE CASE

There are really two questions the court must answer; the answer to the first dictates the substance of the second. For instance, should the proper standard of review be abuse of discretion, then the court must limit its inquiry to whether the Defendant's decision was reasonable, even if the court disagrees. However, should the review be *de novo*, then the court shall decide for itself what conclusion the record brings.[1] This symbiotic paradigm ultimately leaves the court with these two questions: what degree of review should the court give to the record before it; and, has the Plaintiff carried the day in presenting the court with sufficient evidence of disability. Of course, the mere existence of the second question forecasts the court's answer to the first.

### A. STANDARD OF REVIEW

Congress enacted the Employee Retirement Income Security Act of 1974 in order to develop federal protections for private welfare and pension plans. Ronald J. Cooke, *ERISA Practice and Procedure* § 1:1, at 1–3 to 1–4 (2d ed.1996). In so doing, Congress intended that the courts develop a body of substantive federal law that would, *inter alia*, guarantee that vest-

ed benefits be received by eligible participants and assure an honest administration of the benefit plans. *Id.* In other words, Congress left it to the courts to craft a standard of review for plan administrator decisions.

 Accordingly, when a welfare or benefit plan gives to an administrator the discretionary authority to interpret plan terms and participant eligibility, a court may reverse the administrator's decision only upon finding an abuse of discretion. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 605 (4th Cir.1999) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). Thus, an administrator's decision shall remain intact so long as that decision was reasonable; that is, that the decision incorporated deliberation and was supported by substantial evidence. *Id.* (citing *Brogan v. Holland*, 105 F.3d 158, 161 (4th Cir.1997)).

 There is an exception to this general rule, however. Where the plan administrator has a conflict of interest, namely, if the administrator is also the plan's insurer, then the abuse of discretion standard must be modified to account for the accompanying potential for partisanship. *Id.* In deviating from the abuse of discretion standard, courts must do so only to the extent necessary to counteract evidence of undue influence. *Id.* (citing and quoting *Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir.1997)). While a conflict does not require such a deviation per se, it does create a "sliding scale," *Ellis*, 126 F.3d at 233: the amount of deference given to an administrator's denial of benefits is inversely proportional to the degree of self-dealing evident in the record. *Cf. Martin v. Blue Cross & Blue Shield of Va., Inc.*, 115 F.3d 1201, 1206 (4th Cir.1997) (quoting *Doe v. Group Hosp.*

---

1. The Defendant argues in its Motion for Summary Judgment that at no time has the Supreme Court or Fourth Circuit "suggested" that a deferential standard should be abandoned in favor of a *de novo* review whenever a conflict exists. (Def.'s Mot. Summ. J. at

15.) The court disagrees. Quite contrarily, a "sliding scale" suggests nothing other than, in a most egregious circumstance, giving little or no deference at all to a fiduciary's decision. *See Ellis v. Metropolitan Life Ins. Co.*, 126 F.3d 228, 233 (4th Cir.1997).

*& Med. Servs.*, 3 F.3d 80, 85 (4th Cir.1993) (stating that the amount of deference given to a fiduciary's decision must be lessened to the degree necessary to neutralize any untoward influence resulting from the conflict)).

Because the Defendant here is both the insurer and the administrator, and the disability plan confers upon the Defendant discretionary authority,[2] the court will review the record under the modified abuse of discretion standard. Moreover, it is apparent that the Defendant's decision to deny the Plaintiff's claim is entitled to little deference: from the outset it is clear that the Defendant failed to administer the plan impartially, as required by the trust principles accompanying the Defendant's fiduciary position under ERISA. 29 U.S.C.A. § 1002(21)(A) (West 1999).

The court makes this finding from the circumstances surrounding Unum's initial denial of benefits.[3] Jeanette Hines worked as a legal secretary for twenty-eight years before filing a claim for disability on June 2, 1997, (R. at 13, 139–40.), even though her maladies began to surface about seventeen years before. *Id.* at 9. She complained that her migraine headaches, chronic right arm and shoulder pain, and vertigo, combined to make it impossible to perform her job functions, especially since her symptoms were most often associated with work-related stress. *Id.* at 86–87.

As of July 10, 1997, Unum's own physician, Dr. Tanya Horne, noted a multitude of evidence of disability: that the Plaintiff had vertigo for several years; that her symptoms appeared most aggravated *while under the stresses of the workplace;* that she is "*currently* seeing an ENT (an ear, nose and throat specialist), Dr. Neal, after being referred by her primary care physician, Dr. Nuckols;" that her medical records in Unum's possession dated back to 1992; that she has been treated with a number of medications, including meclizine and Valium; that she *frequently* goes to a doctor for Demerol and Phenergan injections for migraine headaches; that during 1996 and 1997, she claimed that her vertigo resulted in her missing seventeen days of work and sometimes totally incapacitated her; that Dr. Neal felt that incapacitation was reasonable based on the symptoms; that Dr. Brasfield, a neurosurgeon, noted chronic right arm pain, possible C8 radiculopathy,[4] and bulging discs.[5] *Id.*

Doctor Horne continued by stating that the impression garnered from this evidence was that Hines had a history of vertigo with persistent nausea and dizziness; that the condition had persisted for years and recently appears to have had an increase in symptomatology so that she is

2. The court notes that the parties do not contest that the disability plan at issue here grants discretionary review to Unum. (Pl.'s Mot. Summ. J. at 6.) Furthermore, the language in the plan itself clearly confers as much. (Def.'s Mot. Summ. J. at 9 (citing the disability plan provisions requiring "proof" of disability).)

3. The court relies on the record as submitted by the Defendant.

4. A radiculopathy is a disease of the nerve root, in this case, the nerve root in the cervical vertebrae. *Dorland's Illustrated Medical Dictionary* 1405, 1831 (27th ed.1988).

5. Bulging disks can be indicative of spinal cord compression, especially in cases of cervical spondylosis. *The Merck Manual* 1516–17 (16th ed.1992). Doctor Brasfield's opinion was that Ms. Hines's C8 radiculopathy was spondylitic in nature. (R. at 35.) Furthermore, spondylitic disk bulging most often occurs in the C5–C6 cervical nerve region, *The Merck Manual* 1516, exactly where bulging was noted in Ms. Hines. (R. at 31). Disk bulging in this area can result in arm weakness and atrophy when accompanied by neural foraminal root compression. *The Merck Manual* 1516–17. These prescribed symptoms closely parallel Ms. Hines's complaints and neural foramina in Ms. Hines were "widely patent." (R. at 44.) Moreover, cervical spondylosis is degenerative in nature, *The Merck Manual* at 1516, the relevance of which will become obvious later in this opinion. However, Unum ignored this and a slew of other testing that arose from Ms. Hine's visits to Dr. Brasfield's practice group.

unable to function at times; that the attacks usually occurred at work and that she had not had an attack since leaving work; and that Hines claimed that the attacks were increased from the head movement involved in typing. *Id.*

In conclusion, Dr. Horne recommended further investigations to determine the extent of Hines's limitations and obtaining the records of previous inner ear tests, performed in 1989 by a Dr. Jackson. *Id.* at 87, 91. After receiving the test results and seeing that they were normal, representatives of Unum immediately ordered an investigator to surreptitiously observe Hines in her day-to-day activities. *Id.* at 105. The surveillance lasted three days and noted Hines walking a dog in a slow manner (three times), doing some shopping (twice) and driving a car (twice). *Id.* at 113–20.

At this point, Unum mailed to Dr. Neal, Hines's attending physician, a copy of the tape and a letter more aptly described as a set of interrogatories. *Id.* at 111. Summarized, the letter asked Dr. Neal to reconcile his restrictions and limitations in Hines's claim with the videotaped activities. *Id.* Dr. Neal refused to view the tape, but responded that what is observed on specific days is not necessarily indicative of what happens on others. *Id.* at 138. Furthermore, Dr. Neal pointed out that Dr. Jackson, whose negative test results apparently precipitated the surveillance, had made a note that Hines probably suffered from central vertigo,[6] which would not be manifest in the results from the inner ear tests conducted. *Id.* at 137.

Dr. Neal continued by saying that all of the doctors' reports and consultations agreed that Hines suffered from some sort of imbalance and that such an imbalance could certainly be present without any ob-

jective evidence. *Id.* Doctor Neal's opinion was that Hines was acutely ill and in distress during her spells and when under workplace stress, and advised a reevaluation with a Dr. Lambert of the Center for Disequilibrium at the University of Virginia, further reminding Dr. Horne that Hines's medical records documented periods in time when Hines had functioned well. *Id.*

In closing, Dr. Neal stated that his primary objection to viewing the videotape was that the tape would not be indicative of Hines's day-to-day workplace activities and how those activities would be affected when she is under stress, dizziness and disequilibrium. *Id.* Notwithstanding Dr. Neal's obvious concern and with no further medical evidence, opinions, or testing, Unum denied Hines's claim just twenty days after Dr. Neal's letter. *Id.* at 139–40.

■ This is a clear-cut case of self-dealing. Unum denied Ms. Hines's claim on nothing more than one series of normal test results, *id.* at 139–40, the probative value of which, with respect to Hines, it knew from Dr. Neal might be questionable, *id.* at 136–38; and a little more than twenty hours of surveillance, *id.* at 139–40, that Unum also knew from Dr. Neal might have little or no bearing on Hines's ability to function at her job. *Id.* at 136–38.

To do so: in the face of eight years of documented medical evidence of migraines, vertigo and right-side disfunction, by no less than eight physicians ranging in speciality from primary care to neurosurgery, all of whom believed in Ms. Hines's claimed condition; in the face of documented treatment ranging from medication, nerve conduction studies, cervical myelograms,[7] cervical epidural steroid injections,[8] to physical therapy; in the face

6. Central vertigo is vertigo due to a disease of the central nervous system. *Dorland's Illustrated Medical Dictionary* 1832.

7. A cervical myelogram is essentially a radiograph, or a film, of the cervical area of the

spinal cord. *Dorland's Illustrated Medical Dictionary* 1087, 1470.

8. This procedure basically involves injecting a steroidial substance into the outermost layer of the three membranes surrounding the spinal cord. *Id.* at 514, 567.

of the claims of Ms. Hines and her attending physician, who after treating this woman for over twenty years would certainly have great insight into her medical condition, that she was not capable of performing her job duties; is borderline unconscionable at best.[9]

Unum swept aside all of this medical evidence in favor of nothing more than the above mentioned test results and a videotape. Any reasonable person would agree that this action reeks of partiality and Unum's attempt to hide behind the veil of administrative discretion cowers in the glare of the ire of this court. Accordingly, the court will review the record before it in a manner produced to offset an obvious effort by Unum to protect its own self interests.

### B. HAS THE PLAINTIFF CARRIED THE DAY IN PRESENTING SUFFICIENT EVIDENCE OF DISABILITY?

Following her initial denial, Ms. Hines's claim went through a total of three administrative reviews, each upholding her denial. ERISA requires that plan administrators give plan participant appeals a "full and fair review." 29 U.S.C.A. § 1133(2) (West 1999). A full and fair review accomplishes two goals: to allow plan fiduciaries to administer plans without a formal adversarial process; and to protect a participant from arbitrary or unprincipled decision-making. *Weaver v. Phoenix Home Life Mut. Ins. Co.*, 990 F.2d 154, 157 (4th Cir.1993) (quoting *Grossmuller v. International Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, 715 F.2d 853, 857 (3d Cir.1983)).

When reviewing an administrator's decision, courts may not consider extrinsic evidence, that is, any evidence not brought before the administrator, initially or in subsequent administrative reviews. *El-*

*liott v. Sara Lee Corp.*, 190 F.3d 601, 608–09 (4th Cir.1999). Accordingly, this court will limit this inquiry to the record as it existed at the time of Unum's final decision.

This review will seek to determine if Unum's decision "is consistent with an exercise of discretion by a fiduciary acting free of the interests that conflict with those of the beneficiaries." *Doe v. Group Hospitalization & Med. Servs.*, 3 F.3d 80, 87 (4th Cir.1993). More succinctly, Unum's decision must not only be reasonable, but appropriate. *See, e.g., Klebe v. Mitre Group Health Care Plan*, 894 F.Supp. 898, 903 (D.Md.1995), *aff'd*, 91 F.3d 131, 1996 WL 405220 (4th Cir.1996); James F. Jorden, et al., *Handbook on ERISA Litigation*, § 4.04[c], at 4–42 (2d ed.2000).

On October 8, 1999, Unum informed Ms. Hines that her denial was appropriate due to a lack of information of her inability to perform as a legal secretary, and because she was not under the regular care of a physician. (R. at 308.) The policy defines disability as an inability to perform material and substantial duties of the participant's regular occupation due to sickness or injury, accompanied with twenty percent or more loss in monthly income.[10] *Id.* at 307–08.

In addition, the policy requires that the participant be under a continuous disability for ninety days from the listed date of disability, a period referred to as the elimination period. *Id.* at 307. The participant must also personally visit a doctor as frequently as is medically required to effectively manage the disability. *Id.* at 306. Unum avers in its denial letter that the above requirements were not met for several reasons, each of which the court will address in due course.

---

9. The myelogram, epidural injections and nerve conduction studies are part of the "slew" of evidence referred to in footnote five that Unum simply cast aside.

10. Loss of income is not an issue in the case.

██ Unum states that "on your [Ms. Hines's] submission of additional medical information regarding a right upper arm extremity and cervical condition, another review of Ms. Hines's claim was conducted." *Id.* at 308. In its review, Unum's medical department noted a lapse of documentation of treatment for this condition from June 24, 1997 to February 4, 1998. *Id.* Therefore, "it appear[ed] that Ms. Hines became asymptomatic, or her condition improved." *Id.*

The ramifications of this observation according to Unum were that Ms. Hines could not have been "continuously disabled" for her right arm condition for the entire elimination period, which ended August 14, 1997, and that she was not under the regular care of a physician for that condition as well. *Id.* at 307–08. However, this "reason" is conclusory in nature and a tenuous extrapolation at best. To make such a conclusion casts a blind eye to the documented degenerative nature of Ms. Hines's right arm condition.[11] *Id.* at 29 (noting, on February 27, 1997, a positive cervical Spurling's that was not present seventeen days earlier), 244 (noting, on February 9, 1998, a degenerative change involving the right acromioclavicular [12]).

Unum company physicians also determined that if Ms. Hines suffered significant pain from her right arm condition, they would have expected treatments to occur between June 24, 1997 and February 4, 1998. (R. at 306.) However, this ignores the fact that Ms. Hines was not working during that time. Unum cannot reconcile its reliance on a lack of treatment as evidence that Ms. Hines was not continuously disabled or under the regular care of a doctor when it knew that Ms. Hines's symptoms occurred almost universally under the stresses of her workplace environment. The court will not sit idly by while Unum dismisses a documented medical

opinion in favor of negative evidence. As noted earlier, Unum here is entitled to little deference in this determination, and the opinions of its own employees are no exception.

Perhaps most damning to Unum's position, Ms. Hines did have to resume therapy for her right arm and shoulder on February 4, 1998, fully eight months prior to Unum's final decision. Because Unum never mentioned in its first denial letter that Ms. Hines's claim was denied in part because of a lapse in time in treatment for this condition, there can be no suggestion that Ms. Hines resumed her treatment in response to the denial.

Moreover, by the time of its final denial, Unum unequivocally knew of these continuing treatments for her condition, a condition considered "severe carpal tunnel" that needs "decompression because of the magnitude of her symptoms." (R. at 220 (statements of Dr. J. Thomas Hulvey).) Unum cannot seriously question the credentialed integrity underlying Dr. Hulvey's opinion, and they do not.

Of particular relevance, Unum stated that this evidence of right arm injury became available as additional information. By Unum's own previous admission however, that assertion is simply not true. Doctor Horne, the Associate Medical Director for Unum, noted in Unum's very first examination of Ms. Hines's claim that "she [Ms. Hines] has also been followed by a neurosurgeon, Dr. Brasfield for *chronic right arm pain* thought to be a possible C8 radiculopathy." *Id.* at 87–88. Since Unum made no mention as to Ms. Hines's right arm condition in its initial denial letter, Unum must have simply disregarded this information from the beginning. *Id.* at 139–40.

---

**11.** As noted previously in footnote five, Dr. Brasfield indicated a likely C8 spondylosis in Ms. Hines. Cervical spondylosis is a degenerative condition. *The Merck Manual* 1516 (16th ed.1992).

**12.** This term refers to anything of and concerning the shoulder and collar bone areas. *Dorland's Illustrated Medical Dictionary* 21.

Unfortunately, rather than realize by the time of its final decision that Ms. Hines's right arm condition should at least be investigated and considered, Unum chose to once again ignore the implications and to sweep this information under the rug. This court cannot think of a single reason why Unum would ignore this medical evidence in the first place, but to disregard substantial evidence of this disability a second time, in favor of retrospectively arguing the possible existence of procedural defects in her claim, descends to bad faith.

Notwithstanding the court's focus on Ms. Hines's right arm and shoulder condition, she also complained of severe vertigo, migraines and associated depression. *Id.* at 86–87, 157–63. In other words, her disability claim did not rest on any one of her maladies standing alone. Hines claimed that under the stresses of her occupation as a legal secretary, one, or all of her symptoms, or combinations thereof, oftentimes totally incapacitated her. *Id.* at 87.

It is important to note that, Ms. Hines's attending physician, Dr. Neal, had recommended that she take a leave of absence for her vertigo as early as 1993. *Id.* at 138. In his physician's statement accompanying her claim, he stated that her suffering from migraines and vertigo, first appearing in 1979, had, as of May 21, 1997, reached a maximum level of medical improvement and that he did not expect any further improvement. *Id.* at 8, 9. His listed restrictions and limitations amounted to any activity that precipitates dizziness, which, as Unum's own physician noted, Ms. Hines associated with the back-and-forth head motions involved in typing. *Id.* at 8, 87.

It is common knowledge that typing is the essential function of a legal secretary, and an inability to do so would definitely "materially and substantially limit" functioning in that capacity. Nonetheless, Unum denied the claim as previously noted. Following the initial denial, Dr. Neal submitted a physical capacities evaluation on April 8, 1998 attesting that Ms. Hines, when symptomatic, had no capacity to sit, stand, walk, lift or carry. *Id.* at 154. She could not use her feet, had a total restriction from unprotected heights or driving automobiles, and could not bend, squat, crawl, climb, or reach. *Id.*

Unum's own physicians came to a different conclusion, however. They concluded that since Ms. Hines did not undergo additional treatment following her second epidural injection, given on June 24, 1997, until February of 1998, she became asymptomatic. *Id.* at 308. When asymptomatic, Unum's physicians opined, reasonable restrictions and limitations would more accurately be defined as no lifting greater than twenty pounds, and no prolonged neck extension, flexion, or rotation. *Id.* at 307.

The physicians, at least in part, must have based their decision upon Dr. Neal's concurrence that when asymptomatic, Ms. Hines functioned pretty well. *Id.* at 192. Under its restrictions and limitations, Unum concluded that by observing proper body mechanics, using proper desk, keyboard and computer monitor height, and by proper positioning of document stands, Ms. Hines would be able to materially and substantially perform her job functions. *Id.* at 261. Once again, by basing Ms. Hines's restrictions and limitations on her abilities when asymptomatic, Unum refused to recognize that Ms. Hines's symptoms typically reached the point of incapacitation when *under stress typical in her place of work.*

Putting aside this most obvious objection to Unum's conclusion, the logic is incredible. Unbelievably, Unum's physicians attempted to convert Ms. Hines's treatment for her right arm and shoulder, the epidural injections, into a successful treatment for her migraines and vertigo. In its final rejection letter, Unum states:

As indicated in our letter of October 1, 1998, based on the medical evidence, reasonable restrictions and limitations

as of May 16, 1997 would be no lifting greater than 20 pounds, no prolonged or repetitive neck flexion, extension or rotation. It was noted that subsequent to an epidural injection on June 24, 1997, there is no further documentation of treatment thereafter until February 4, 1998. Based on no continuing treatment after June 24, 1997, it is presumed that the injection brought prolonged relief. *Since there is a lack of medical documentation to support continuing symptoms, the above restrictions and limitations would not be necessary subsequent to June 24, 1997. Id.* at 307 (emphasis added).

Doctor Neal was the only doctor that provided any restrictions and limitations for this claim. Yet those restrictions and limitations were based solely on her symptoms of migraines and vertigo, the only conditions that Dr. Neal treated. A lapse in treatment for her right arm and shoulder, the epidural injections, would have absolutely no bearing on whether Dr. Neal's restrictions and limitations, based on vertigo and migraines, were reasonable. It is simply hard for this court to accept that trained physicians could make this type of oversight in the absence of Unum simply looking for ways in which to deny Ms. Hines's claim.

The court further notes that the Fourth Circuit has yet to formally decide whether the "Treating Physician's Rule," applicable in social security cases, should be used in ERISA cases. *Elliott v. Sara Lee Corp.,* 190 F.3d 601, 607 (4th Cir.1999). Accordingly, this court will not do so, with the following caveat: in an ERISA case, a treating physician should be given at least as much deference as any other, except in those cases where abuse of discretion is clearly the proper standard of review.

Furthermore, in those cases where the standard of review has been modified to counteract untoward influences, a treating physician should be given greater deference than an employee of the administrator/insurer. Given this realization, this court simply cannot accept the opinion of Unum's own physicians, based solely upon an examination of the paper record, over that of Doctor Neal, Ms. Hines's treating physician for over twenty years. This result is especially warranted in light of the fact that Dr. Neal has absolutely no interest in the outcome of this matter, unlike his colleagues in contest.

This puts to rest the issues that principally arose from Ms. Hines's initial claim for disability. In her appeals of denial Ms. Hines submitted additional evidence. This evidence consisted of a psychological evaluation by Dr. Sharon Hughson, (R. at 157–63), a vocational assessment by Dr. Robert Spangler, (R. at 271–75), and a determination of disability dating back to May 16, 1997 by the administrative law judge presiding over Ms. Hines's social security disability claim. (R. at 195–200.)

The court sustains Unum's objections to Ms. Hines's psychological evaluation, principally because the psychologist never indicated in her report whether Ms. Hines's current mental condition dated back to her date of disability. In addition, there are questions raised by the psychologist as to the validity of some of Ms. Hines's test results.

Unlike the psychological evaluation, Ms. Hines's vocational assessment by Dr. Spangler does affirmatively state that "based on the medical records, these test results and the reasonable accommodations made by Mrs. Hines's employer during the last two years on the job as a legal secretary, Mrs. Hines is under a vocational disability of 100% and has been since leaving her position." *Id.* at 271. In making this evaluation, Dr. Spangler personally subjected Ms. Hines to a wide range of testing methods, a clinical interview and reviewed her medical history. *Id.* at 272.

However, in a single paged, handwritten report, Unum summarily dismissed Dr. Spangler's report. Unum's own staff physician, Dr. Peter Mirkin, based solely on a paper review of Dr. Spangler's report, con-

cluded that the report could not establish Ms. Hines's vocational ability as of May 1997. *Id.* at 303. Doctor Mirkin also opined that Ms. Hines's extensive use of medications "could be very significant" in its effect on Doctor Spangler's evaluation. *Id.* Markedly, Unum misses the point. Simply because Dr. Mirkin says it is so, does not make it so. Doctor Spangler obviously came to the opposite conclusion.

With respect to Dr. Mirkin's opinion, the court finds that it must give Dr. Spangler's report controlling weight. Due to Dr. Mirkin's association with Unum, and Unum's demonstrated bad faith, his analysis of Dr. Spangler's assessment must be viewed with a high degree of suspicion. In contrast, the court does not view Dr. Spangler's report in the same light and further finds that Dr. Spangler's hands-on evaluation of Ms. Hines is credible evidence of her vocational abilities as of May 1997.

■ Hines also submitted her favorable decision regarding her social security claim. *Id.* at 195–200. This court's willingness to consider the findings of the Administrative Law Judge (ALJ) depends upon whether Unum's plan is sufficiently analogous in its definition of disability to the definition given by Social Security Administration regulations. *Elliott v. Sara Lee Corp.*, 190 F.3d 601, 607 (4th Cir.1999). Within the context of social security claims, a person is disabled if they have an

> "inability to do any substantial gainful activity by reason of any medically determinable physical or medical impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a) (1999).

■ Unum's plan provides, in part, that a person is disabled when [you] are "limited from performing the material and substantial duties of your regular occupation due to sickness and injury." (R. at 140.) While Unum is not bound in any way by the determinations of the ALJ, it

should have at least considered those findings as relevant evidence. *Elliott,* 190 F.3d at 607 (stating that where there is no indication that a disability plan is analogous to social security regulation, a plan administrator is under no obligation to weigh the agency's determination *more favorably* than other evidence) (emphasis added).

Moreover, the definitions are sufficiently similar to find that Unum should have given the ALJ's findings significant weight. As has happened so often with other evidence in Ms. Hines's claim, however, there is no indication that Unum gave the ALJ's decision any true consideration at all. In a letter dated August 7, 1998, Unum did provide lip service to the findings, and indicated that those findings were based in part on restrictions and limitations that they had no evidence of, including a bilateral dexterity condition, and the condition with her hands and arms. (R. at 211.)

■ This is not the case. As noted previously, Unum was well aware of Ms. Hines's right arm and shoulder difficulties since Dr. Brasfield's and other neurologist's tests in the early parts of 1997. *Id.* at 87. The court finds that the ALJ's decision is substantial evidence that Ms. Hines is and has been disabled since May 16, 1997. The court further finds that the medical record, as brought forth throughout this opinion, including the ALJ's decision, overwhelmingly supports a finding that Ms. Hines is disabled under the terms of the disability plan, as insured by Unum and provided by her employer, and has been so since May 16, 1997. While the Defendant suggested in oral arguments that a remand to Unum would be proper in this case should the court find in favor of the Plaintiff, such a remand is not called for where, as here, the evidence clearly shows that Unum abused its discretion. *Weaver v. Phoenix Home Life Mut. Ins. Co.,* 990 F.2d 154, 159 (4th Cir.1993).

In addition to her disability benefits, the court may in its discretion award reasonable attorneys' fees and costs. 29 U.S.C.A. § 1132(g)(1) (1999). The Fourth Circuit has elicited the principal factors a district court must consider when awarding fees and costs in an ERISA claim. Among those factors are: 1) bad faith; 2) ability to pay; 3) potential for deterrence; and 4) the relative merits of the parties' claims. *O'Bryhim v. Reliance Standard Life Ins. Co.*, No. 98–1472, 1999 WL 617891, at *9–10 (4th Cir. Aug. 16, 1999) (citing *Quesinberry v. Life Ins. Co. of N. Am.*, 987 F.2d 1017, 1029–30 (4th Cir. 1993)).

The court is of the opinion that once it makes a sufficient finding of bad faith, the remaining factors necessarily follow. *O'Bryhim*, 1999 WL 617891, at *10 (affirming the district court's focus on bad faith in awarding fees and costs). The record here clearly establishes Unum's bad faith in administering the plan: Unum readily jumped to secretly videotape Ms. Hines without sufficient justification; Unum failed to consider Ms. Hines medical evidence surrounding her right arm and shoulder; and Unum extrapolated a change in restrictions and limitations based upon unrelated medical evidence.

The court further finds that Unum has the ability to pay Ms. Hines's' fees, that granting attorneys' fees can be a substantial deterrent to similar, subsequent conduct, and that Ms. Hines's claim, relative to Unum's defense, had much greater merit. Thus, Ms. Hines is entitled to reasonable attorneys' fees.

In assessing what constitutes reasonable fees, the court directs the parties to consider: a reasonable rate, comparable to that charged in the community by lawyers of comparable skill, experience and reputation for similar services, *Blum v. Stenson*, 465 U.S. 886, 895, 896 n. 11, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984); a reasonable number of hours, excluding those that are excessive, redundant, or otherwise unnecessary, *Hensley v. Eckerhart*, 461 U.S. 424, 434, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983); and the results obtained. *Id.* at 435, 103 S.Ct. 1933. As mentioned previously, the court also awards pre- and post-judgment interest on the amount owed, as will be determined at a later date.

## IV CONCLUSION

For reasons set forth above, the court GRANTS the Plaintiff summary judgment in full as to all her claims. Accordingly, the court DENIES the Defendant's motion. The Plaintiff is hereby ORDERED to submit to the court petitions for fees and costs, and monies owed, including interest, within twenty days of the date of this order. The Defendant shall thereafter have an additional twenty days to respond. The Clerk is directed to send certified copies of this Memorandum Opinion to counsel of record.